WILLIAM F. CURRAN *vs.* WILLIAM Z. CLAYTON.

Penobscot.    Announced July 19, 1893.    Opinion November 8, 1893.

*Elections.   Australian Ballot Law.   Defective Ballots.   Decision of Board of Aldermen,—when reviewable.   R. S., c. 4;   Stats. 1880, c. 193; 1891, c. 102; 1893, c. 260.*

The elective franchise must be exercised under such regulations and restrictions as the legislature may deem reasonably necessary to maintain order at elections, prevent intimidation, bribery and fraud, preserve the purity of the ballot box and thus secure a genuine expression of public sentiment.

Statutes designed to secure complete and inviolable secrecy of ballots cast at public elections should be construed, under established rules, with reference to the mischief to be remedied and the object to be accomplished; and interpreted, if practicable, so as to promote and not destroy the purpose of their enactments.

The enactment of the Stat. of 1891, c. 102, popularly known as the "Australian Ballot Law," was designed to inaugurate an important departure from the mode of voting which had existed in this State prior to its passage.

Its distinguishing feature is its careful provision for a secret ballot.

Under this statute giving the voter a clear opportunity to designate by a cross mark (✗) his choice of candidates, the place and method of marking the ballot being regulated and defined in the statute, *it was held* that ballots defectively and illegally marked as follows should be rejected:—

(1.) Where the cross (✗) was placed above the name of the candidate, and not in the appropriate place at the right of it;

(2.) Where there was a cross (✗) above and also one beneath the candidate's name, but none at the right of it;

(3.) Where the cross (✗) was placed at the left of the name of the candidate;

(4.) Where there was a cross (✗) under the party name at the head of the ticket and one at the left of the defendant's name on another party ticket;

(5.) Where there was no cross (✗) whatever, but a short, straight line drawn across the square at the right of the party name at the head of the ticket;

(6.) Where there was a cross (✗) in the square at the right of the name of each candidate except that for Mayor, on one party ticket, and a cross (✗) in the square at the right of the party name on another ticket.

The board of aldermen in the city of Bangor re-examined the ballots cast for alderman in ward seven, counted for defendant the six ballots above described, and declaring that there was no choice, ordered a new election to be held. The defendant securing a majority of the ballots then cast claimed to hold the office by virtue of the second election; that the subject matter

was within the exclusive jurisdiction of the board of aldermen; and that the ballots alleged to be defective and irregular were properly counted for him. The plaintiff thereupon began his proceeding in equity under R. S., c. 4, and Stat. of 1893, c. 260, amendatory thereto, asking the court to take jurisdiction of the matter, and require the defendant to surrender the office to the plaintiff. *Held;* that the decision of the board of aldermen is subject to review by this court; that the city charter is to be construed as affording a cumulative or primary tribunal only, and not an exclusive one; that it does not preclude a contestant from resorting to the court for a revision of a question of law; and that the decision of the board of aldermen involved the determination of a question of law and not an issue of fact, or a matter of discretion.

IN EQUITY.

This was an appeal from a final decree in equity rendered in the court below, in favor of the plaintiff, where there was a hearing upon the bill, answer and testimony. The case upon the appeal was certified to the Chief Justice and argued in writing.

Both parties claimed to have been elected alderman in ward seven, in the city of Bangor. The case is stated in the opinion. The plaintiff's bill, omitting the jurat, is as follows :

"State of Maine.    Penobscot, ss.

"To the Supreme Judicial Court.    As in Equity.

"William F. Curran, of Bangor, in the County of Penobscot, petitions and complains against William Z. Clayton, of Bangor, in said County, and says :

"That he, said Curran, is a natural born citizen of the United States, of the age of twenty-nine years ; that he is now and has been for several years past continuously a legal resident in and duly qualified voter of, Ward Seven, in said City of Bangor ; that he is legally qualified to be elected to and hold the office of Alderman from said Ward Seven, in the City Council of Bangor.

"That he was duly elected and qualified as Alderman of said Ward Seven, in March, 1892, and held said office for the municipal year then next ensuing ; that at the regular annual city election in said Bangor, on the second Monday of March, 1893, duly and legally held under the provisions of law and especially of Chapter 102 of the Public Laws of 1891, he was a candidate for re-election as Alderman for said Ward Seven, in

the City Council of said Bangor, for the municipal year then next ensuing; that as such candidate his name was duly and properly placed upon the official ballot to be used at said city election in said Ward Seven; that of the qualified electors of said Ward Seven, at said election of March, 1893, he received a clear majority over all the other candidates voted for as Alderman at said election in said Ward Seven, in that of the different candidates for Alderman, whose names appeared upon the official ballots cast at said election in Ward Seven, the qualified electors of said Ward, by proper cross upon the official ballot indicated their choice as follows, viz:

"The respondent, William Z. Clayton, had 295 votes.

"Said William F. Curran, had 310 votes.

"John S. Ellis, had 12 votes.

"The whole number of ballots cast for Alderman was 617 votes.

"Necessary for a choice, 309 votes.

"And your petitioner was duly declared elected as said Alderman.

"That at said election in Ward Seven, all the votes given in for the several offices, including the said office of Alderman, were properly sorted, counted, declared and registered in open Ward meeting by the Warden of said Ward, in the presence of the Clerk of said Ward, who caused the names of the persons voted for and the number of votes given for each to be written in words at length, and duly and properly recorded.

"And the Ward Clerk of said Ward Seven did within twenty-four hours after said election, to wit, in the evening of the said second Monday in March, 1893, deliver to said Curran, a certificate of his election as Alderman for said Ward Seven, in said City Council as aforesaid.

"And said Clerk of Ward Seven did forthwith deliver to the City Clerk of said Bangor, a certified copy of the records of said election; that on the third Monday of March, 1893, the Aldermen and City Council elect, duly met in convention, when and where, no one protesting, the oath of office was duly administered to your petitioner to perform the duties of Alderman

from Ward Seven in the City Council of Bangor, for the municipal year then next ensuing, whereupon your petitioner assumed the duties of said office, and continued to perform them until the unlawful assumption of the same by the respondent as hereinafter stated.

"That at a meeting of the Board of Aldermen of said city, held on the 5th day of April, 1893, said board against the protest of your petitioner improperly and illegally went behind the said returns of said Clerk of Ward Seven, in so far as they related to the election of an Alderman, and recounted the ballots cast at said election in Ward Seven, and by counting as cast for said respondent six ballots so defectively, improperly and illegally marked as to make it impossible to determine the voters' choice for Alderman, (five of said six ballots having been properly and legally rejected and marked as defective in the said counting at said ward meeting, and one of said six ballots having been counted for Mayor only and properly not counted for Alderman at said ward meeting,) the whole number of votes cast for Alderman in said election was claimed to be increased from 617 to 622, and therefore said 310 votes cast for your petitioner were claimed not to constitute a majority of said 622.

"Your petitioner further says that said recount showed an error in the ward count of one too many votes for said Clayton, so that the actual legal votes cast at said election for said Clayton were 294 instead of 295, which 294 together with said six ballots illegally counted for said Clayton made a total of 300 votes claimed at said re-count as cast for said Clayton; and thereupon said Board of Aldermen voted that there was no election of Alderman at said election of 2d Monday of March, 1893, in Ward Seven, and ordered a new election against the protest of your petitioner, who says that said attempted re-canvas of the votes cast at said election in Ward Seven, on 2d Monday of March, 1893, was improper and without authority of law.

"The acts of the ward officer in the absence of fraud or willful misconduct, in declaring your petitioner elected were conclusive in the premises and not subject to review by the

Board of Aldermen, and even if they were a subject of review by the Board of Aldermen, they acted illegally in counting said six defective ballots, as indicating the voter's choice of said respondent or any one else for Aldermen.

"And your petitioner through the City Committee, and directly himself, notified the City Clerk that he should take no part in said second election, and not to print his name upon the official ballots, and his name was not printed thereon, and he in no manner participated in said election, which was held on the eighth day of May, 1893, whereat said respondent claims to have been elected to the office of Alderman of Ward Seven, in said City Council for the municipal year 1893 and 1894.

"That said respondent holds a certificate of election to said office issued to him in pursuance of said election of May eighth, 1893, by Ward Clerk of Ward Seven, and said respondent was sworn in to said office on the 9th of May, 1893, and now claims to hold said office in pursuance of said election of May 8th, 1893, to the exclusion of your petitioner.

"Your petitioner, William F. Curran, a person eligible to said office and claiming to be elected to said office of Alderman from Ward Seven, in the City Council of Bangor for the municipal year 1893 and 1894, as hereinbefore more fully set forth, proceeds against said respondent, William Z. Clayton, who claims to hold said office as hereinbefore more fully set forth. And your petitioner as a part of this bill of complaint begs leave to refer to and produce in court, in so far as the same may be pertinent to the issue, the records, or certified copies thereof, of said Ward Seven, and of said City, and to produce for the inspection of the court the aforesaid ballots cast, and claimed to have been cast at said election of 2d Monday in March, 1893.

"And your petitioner prays that time and place may be set for hearing upon this petition, and said adverse party notified thereof as provided by law, and that said adverse party may be required to file at said time and place of hearing, an answer traversing the facts hereinbefore set forth, which he does not mean to admit, and that all the facts hereinbefore stated not denied by the respondent shall be taken as admitted by him.

"And your petitioner further prays that if judgment is awarded in his favor an order of court may be issued against said respondent commanding him to yield up said office, and that your petitioner may be allowed to enter upon the duties of said office, the forms of all which orders are particularly specified in sections 53 to 57 of Chapter 4 of the Revised Statutes, and acts additional thereto, and amendatory thereof especially of Chapter 260, of Public Laws of 1893; and your petitioner prays that costs may follow judgment, in his favor.

"Bangor, Maine, May 12, 1893.                    WM. F. CURRAN."

The defendant's answer discloses two grounds of defense; first, that the board of aldermen had exclusive jurisdiction of the subject matter under § 25 of the city charter; and, second, that the ballots alleged to be defective and irregular, were properly counted for the defendant.

*Matthew Laughlin*, for plaintiff.

1 Dill. Mun. Corp. 2d Ed. c. 9, § 141. Language of city charter does not exclude common law courts from power to review acts of the aldermen. If court, previous to act of 1893, had such power, there can be no question that it has additional power now.

A single straight line does not constitute a cross. Wigmore's Aust. Ballot Law, page 178, citing Indiana statute of 1889. Five ballots defective under Stat. of 1891, § 10. See R. I. Stat. of 1889, § 6, and opinion of the Justices. If the rule of "intention," as contended by defendant, governs, it applies to all the ballots, and we shall have no rule at all, instead of the plain and precise rules laid down by the legislature for printing and marking ballots. The rule of "intention," cannot be a fixed one, and, if adopted by the court, must be left to the varying and partial judgments of different sets of presiding officers. Their judgment would in turn be reviewed by a single justice, to be reviewed again by all the judges; so that this court is to be made the final counting and canvassing board in every case, great or small, when a candidate may think the presiding officials at the polls doesn't guess at the voter's intention in the way the candidate himself might desire.

*H. L. Mitchell*, City Solicitor, for defendant.

City charter gives the board exclusive jurisdiction unless it is affirmatively shown that the decision was arrived at through prejudice, undue influence, corrupt motives, or illegal methods amounting to a legal wrong. It must appear that the acts of the board were illegal. *Rounds* v. *Smart*, 71 Maine, 380; *Sanders* v. *Getchell*, 76 Maine, 158; *Pierce* v. *Getchell*, *Id*. 216; *Opinion* of *Justices*, 70 Maine, 560. Analogous cases in which the court will not assume to review proceedings of tribunals or bodies acting within their limits of jurisdiction are towns and juries. *Googins* v. *Gilmore*, 47 Maine, 9; *Williams* v. *Bunker*, 49 Maine, 427; *Peabody* v. *Hewett*, 52 Maine, 33; *Farnum* v. *Virgin*, *Id*. 576; *Drown* v. *Smith*, *Id*. 141; *Hovey* v. *Chase*, *Id*. 304; *Gleason* v. *Bremen*, 50 Maine, 222; *Folsom* v. *Skofield*, 53 Maine, 171; *Darby* v. *Hayford*, 56 Maine, 246; *Fessenden* v. *Sager*, 53 Maine, 531.

Legislature should not deny right of suffrage, either directly or by making it so difficult or inconvenient as to amount to a denial, *Dewitt* v. *Bartley*, 146 Pa. St. 592. Section 24 of Stat. 1891, c. 102, is directory how to prepare and deposit ballots. Section 27 makes it the duty of the proper officers to give full force and effect to the vote, to count it for the candidate that the elector intended it, thus give effect to the statute in accord with the decisions of this court heretofore given relative to the right of suffrage secured to the citizen by the constitution. All the statutes relating to the same subject matter should be taken into consideration. *Smith* v. *Chase*, 71 Maine, 164; *Collins* v. *Chase*, *Id*. 434. Comparing the Stat. of 1891 with the Constitution and all laws heretofore enacted, it is the duty of the warden or municipal officers to count all votes in favor of the candidates that the canvassing board understand, by inspection of the ballot, the elector intended to vote for.

Ballot with only one mark, a cross over defendant's name shows, beyond doubt and argument, an intent to vote for defendant as alderman. Ballot which has two crosses, one over the defendant's name and the other under it, the rest of the ticket being without marks, shows that the elector intended to vote for

the defendant as alderman, and the candidate, (the mayor,) whose name is above the defendant's, and for no other candidates.

As to ballots marked at the left of the candidates' names, there is no provision in the statute requiring the rejection of the ballot. The provision for placing the mark at the right of candidates' names is directory and not arbitrary; intended as an instruction in preparing ballots that confusion may be avoided in adopting this method of election.

In *Parvin* v. *Wimberg*, 130 Ind. 561, the court held that the construction of an election law that had been accepted and acted upon by the officers, whose duty it was to administer the law, will not be ignored by the court unless it is palpably wrong.

SITTING : PETERS, C. J., WALTON, EMERY, FOSTER, HASKELL, WHITEHOUSE, JJ.

WHITEHOUSE, J. At the municipal election held in the City of Bangor, on the second Monday of March, 1893, the parties to this proceeding were opposing candidates for the position of Alderman, from Ward Seven.

The plaintiff was declared by the warden to have 310 of 617 ballots cast for Alderman, received from the ward clerk a certificate of his election as Alderman, took the qualifying oath and entered upon the discharge of the duties of the office.

Subsequently, however, the Board of Aldermen re-examined the ballots cast for Alderman in Ward Seven, counted for the defendant six ballots which had been rejected by the warden as defectively and illegally marked, and declaring that there was no election of Alderman in that ward, ordered a new election to be held on the eighth day of May. In this second election the plaintiff refused to participate, and the defendant, securing a majority of the ballots then cast, claimed to hold the office by virtue of the second election. Thereupon the plaintiff instituted this proceeding in equity in accordance with the provisions of chap. 4, R. S., and chap. 260 of the Public Laws of 1893,

amendatory thereof, asking the court to take jurisdiction of the matter and require the defendant to surrender the office to the plaintiff.

The cause was heard by a single justice sitting in equity, and a decree rendered in favor of the plaintiff, declaring that he was legally elected Alderman in ward seven, on the second Monday of March, and that the second election was without authority and void.

The defendant now brings the case to this court, by an appeal from that decree, claiming in the first place that the subject matter was within the exclusive jurisdiction of the Board of Aldermen ; and secondly, that the ballots alleged to be defective and irregular, were properly counted for the defendant.

I.   The six ballots in question were properly rejected by the warden, and improperly counted for the defendant by the Board of Aldermen.

It is provided in sect. 10 of chap 102 of the Public Laws of 1891, popularly known as the Australian Ballot Law, that "The ballots shall be so printed as to leave a blank space at the right of the name of the party or political designation, and also at the right of the name of each candidate, so as to give to each voter a clear opportunity to designate by a cross mark, ( × ) therein his choice of candidates."

In the official ballots prepared under the act, at the right of the party name at the head of a group of names, and also at the right of the name of each candidate of the party group, a blank space was accordingly left, and the outlines of a square or rectangle printed therein.

It is also provided by sect. 24 of the act in question that, "The voter shall prepare his ballot by marking in the appropriate margin or place a ( × ) as follows :   He may place such mark opposite the name of a party or political designation, in which case he shall be deemed to have voted for all of the persons named in the group under such party or designation ; or he may place such mark opposite the name of the individual candidates of his choice for each office to be filled."

It is further provided by sect. 27 that, "If a voter marks

more names for any office than there are persons to be elected
to such office, or if for any reason it is impossible to determine
the voter's choice for an office to be filled, his ballot shall not be
counted for such office."

It will be observed that this act of 1891 contains no express
provision for *squares* on the ballot.

With respect to the ballots in controversy it appears that on
the one designated "No. 2," the (×) was placed by the voter
above the name of the defendant as candidate for Alderman, and
not in the appropriate place at the right of it; on "No. 3,"
there was a cross above and also one beneath the defendant's
name, but none at the right of it; on "No. 6" the cross was
placed at the left of the defendant's name; on "No. 7" there was a
cross under the party name at the head of the ticket, and one
at the left of the defendant's name; and on "No. 8" there was no
cross, (×) whatever, but a short, straight line drawn diagonally
across the square at the right of the party name, on the de-
fendant's ticket.

On "No. 48," not marked defective, there was a cross in the
square at the right of the name of each candidate except that
for Mayor, on the defendant's ticket, and a cross in the square
at the right of the party name on another ticket.

It is contended by the defendant that, notwithstanding these
deviations from the literal requirements of the statute, the
elector's intention in each instance was sufficiently disclosed
by the marks actually made; that it was not "impossible to
determine the voter's choice;" and that these provisions of law
respecting the preparation of the ballot by the voter should be
construed as directory and not mandatory, in order that the
intention of the elector may be effectuated and not defeated
whenever it can be discovered by an inspection of the ballot.

Whatever weight this argument may have been entitled to, or
may have received, under the system which formerly prevailed
in the conduct of elections, it must be remembered that the act
of 1891, now under consideration, was designed to inaugurate
an important departure from the mode of voting which had
existed in this State prior to its passage.

It is a recognized and familiar principle that the elective franchise, though guaranteed by the constitution as a sacred privilege to the persons there named as electors, must still be exercised under such regulations and restrictions as the legislature may deem reasonably necessary to maintain order in the elections, prevent intimidation, bribery and fraud, preserve the purity of the ballot box and thus secure a genuine expression of public sentiment.

It is not claimed that there is anything unreasonable or difficult to be understood in the regulations established by the act in question.

Its distinguishing feature is its careful provision for a secret ballot. The leading purpose of it was to give the elector an opportunity to cast his vote in such a manner that no other person would know for what candidate he voted, and thus to protect him against all improper influences and enable him to enjoy absolute freedom from restraint and entire independence in the expression of his choice. It was designed to secure complete and inviolable secrecy in that respect, and under established rules of construction it should be examined with reference to the mischief to be remedied and the object to be accomplished, and interpreted, if practicable, so as to promote and not destroy the purpose of its enactment.

With respect to four of the ballots it has been seen that the cross mark was placed either at the extreme left or midway above or below the name of the party or candidate, and not in the appropriate "blank space at the right" of such name, left for that purpose as required by the act of 1891; while on one of the ballots a short, straight line was used to mark the ballot instead of a cross.

If it be conceded that the intention of the voter may be correctly inferred from the mark actually made by him in each of these instances, it is still a fatal objection to the ballot that such an irregular and unauthorized mode of marking it might readily be, and probably would be, agreed upon with the voter as a distinguishing mark to identify the ballot cast by him whenever identification was desired. Such a palpable disregard of the

plain requirements of the act strikes at the root of the secret ballot system.

Furthermore, if such marks were to be held effective, embarrassing questions respecting the intention of the voter would constantly arise upon inspection of the ballots, and great uncertainty and confusion inevitably result.

The recent case of *Parvin* v. *Wimberg*, 130 Ind. 561 (30 Am. State 254), brings in question the construction of a similar statute, which, however, prescribes the form for a ballot with squares printed on it, and requires the squares to be stamped by the voter as the means of casting his vote.

The court say : "The legislature has declared that the mode by which the elector shall express his choice shall be by stamping certain designated squares on the ballot.

There is nothing unreasonable in the requirement, and it is simple and easily understood.    If he does not choose to indicate his choice in the manner prescribed by law he cannot complain if his ballot is not counted.    If ballots are to be counted when no square is stamped, at what distance from the square shall the stamp be placed before it can be rejected?    One board of election officers may reach one conclusion as to a class of ballots when the squares are not stamped, and another board may reach another and a different conclusion.    If we hold this statute to be directory merely and not mandatory, we are left entirely without any fixed rule by which officers of elections are to be guided in counting the ballots."

In the State of Rhode Island the statute, like ours, makes no express provision for squares on the ballot but declares that the ballot shall be so printed as to give each voter a clear opportunity to designate his choice by a cross mark "in a sufficient margin at the right of the name of each candidate," and that the elector "shall prepare his ballot by marking in the appropriate margin or place a cross opposite the name of the candidate."    As in this State, however, the official ballots appear to have been prepared with squares outlined upon them at the right of each name.

In 1890 the question was submitted to the Supreme Court by

the Governor, whether any mark other than a cross placed in the square at the right of a name could be counted as a vote, and the court say : "Our opinion is that a cross is the only mark that can be counted as a vote." But in answer to a second question, the court hold that inasmuch as their statute does not distinctly provide for squares upon the ballots, "a cross placed in the margin of the ballot on the right of, and opposite to the name of a candidate, should be counted as a vote for the candidate opposite to whose name it is placed, whether the margin have a square in it' or not, and, if there be a square in it, even though the cross is without or partly without the square. *In re the vote marks*, 17 R. I. 812.

The elector who marked ballot "No. 48" effectually marked the names of two candidates for Aldermen from ward seven, and by the plain terms of the statute his ballot could not legally be counted for such office.

II. The decision of the Board of Aldermen is subject to review by this court. True, the City Charter of Bangor says of the City Council that "each board shall judge of the election and qualification of its own members," but this is to be "construed to afford a cumulative or primary tribunal only, and not an exclusive one." Dillon's Mun. Corp. § 202. It will not preclude a contestant from resorting to the court for a revision of a question of law.

"The principle is that the jurisdiction of the court remains unless it appears with unequivocal certainty that the legislature intended to take it away." Dillon's M. C. § § 202, 203, and authorities cited. See also *Andrews* v. *King*, 77 Maine, 224, where the supervising power of the court was carefully considered.

It has been the policy of the legislature of this State to enlarge rather than to restrict the admitted power of the court to inquire into the regularity of elections.

Chapter 198 of the laws of 1880 (incorporated in R. S., ch. 4), authorized a special proceeding in equity by a contestant for any county office, and chap. 260 of the laws of 1893, extended the scope of this statute to include a contestant for any

municipal office "who has been declared elected thereto by any returning board or officer."

In the case at bar it has been seen that the decision of the board of Aldermen brought in question the construction of the statute of 1891. It involved the determination of a question of law and not an issue of fact or a matter of discretion.

The ruling of the single justice that their action was subject to revision by this court, was clearly correct.

*Decree below affirmed with additional costs.*