# CHARLESTON.

Morris v. Board of Canvassers of City of Charleston.

Decided April 17, 1901.

1. Election—*Ballot Sheet—Voter.*

   A voter must use only one of the ballots on the election ballot sheet, and the names of all candidates for whom he votes must be found on that one ballot. If some names are on one ballot, some on another, the voter does not vote for any candidate. (p. 254).

2. Voting—*Mistakes—Irregularities.*

   As to mistakes and irregularities in elections, a distinction exists between those made by the voter and those made by officers of election. In the former case such mistakes and irregularities may often destroy the ballot, while those of officers do not affect the election, if a fair election has been held. (p. 262).

3. ELECTION STATUTES—*Mandatory.*

     Statutes mandatory and directory; more particularly election statutes. (p. 263).

4. CONSTITUTION CONSTRUED—*Legislative Power.*

     The Constitution, in article IV, section 11, gives wide powers to the legislature to make all reasonable regulations and restrictions as to preparation of ballots and the conduct and returns of elections. (p. 264).

Application by Ham Morris, Jr., for writ of *mandamus* to board of canvassers of city of Charleston.

Refused.

W. E. R. BYRNE, JOHN H. HOLT and GEO. E. PRICE, for petitioner.

MOLLOHAN, McCLINTIC & MATHEWS and PAYNE & PAYNE, for respondent.

  BRANNON, PRESIDENT:

At the city election in Charleston, March 11, 1901, Ham Morris and Will W. Wertz were competing nominated candidates for the office of recorder, and the returns showing a tie vote between them, Morris demanded a recount of the ballots, and while that recount was in progress before the city council as a canvassing board the board rejected certain ballots entirely from the recount, because all the candidates appearing to have been voted for were not in the same column on the ballot sheet, this being so as to these two candidates, and Morris applied to. this Court for a writ of *mandamus* to compel the council to count such rejected ballots and all similar ones that had not been acted on as yet as to said office.

The question is, must the names of all the candidates for whom a voter intends to vote be found in one column of the ballot sheet, or may one name be in one column, another in another column, and still another in another column? Certainly the popular understanding and construction of our election statute first enacted in 1891, known as the "Australian Election Law," has been that all names of those candidates voted for must be found in one column. Such has been the uniform construction of it by the ballot commissioners acting under section 44 of that act, in their official instructions to voters previous to elections,

posted at the polling places. Such has been the construction of it by the executive committees of the political parties. Is that construction wrong or right? We have concluded that it is right. Section 34, chapter 3, Code 1899, provides that the sheets to contain election ballots shall have separate columns, that is, printed ballots, side by side for the printed names of candidates, one column for each political party, containing the printed name of its nominated candidates. The head of each column is to be distinguished from the other column by having in bold type the name of the party to whose candidates it is assigned. The section provides that the names of all candidates of a given party shall go in the column assigned that party, and it says that no other name shall go in that column. So far the purpose to have distinct columns is clear. This direction must have some meaning, else it would not be so distinctly given. Another feature of section 34 is, that under the name of a candidate printed in the ballot shall be left a blank space half an inch wide, and in immediate connection the section says that "a voter desiring to erase the name of any candidate from the ballot he intends to vote, or to vote for any other candidate or person in his stead, may strike out the name so printed on the ballot, and write in the blank space next following the name of the candidate or person for whom he so desires to vote." Now, here we see that the legislature contemplated that a voter would and should select from the various columns of ballots on the sheet that column representing, either wholly or in the main, his preference, and having done this, the legislature contemplated that the ballot selected might not wholly suit the voter in its printed names; that he might want to erase a name there printed, and substitute one found elsewhere on the ballot sheet, in a ballot of some other party, or a person unknown to any ballot, and therefore the section gives him right to so erase a name from the ballot which he has selected, and write in it another name in such blank space. Thus, the statute in plain terms tells the voter that he must write that other name in that blank space. When the section tells the voter to write this new name in a particular spot, it is plain that it does not mean that he may write it in another spot, or leave it in another column. This goes far to manifest a specific legislative intent that one ballot on the sheet, and only one, shall be used by the voter, else why does the statute tell him to erase one name from "the ballot he intends to vote," meaning that particular selected bal-

lot, and write in the name he prefers? This operation is confined to that particular ballot. The voter is not told to leave the preferred name on another ballot if printed there, or to write it on another ballot, and that this will do if his intent is plain but confines his change of name to the "ballot he intends to vote." If the design was, after such specific direction, to save the vote notwithstanding the departure from the rule prescribed by the statute on account of the plain intent of the voter, we might expect some provision to that end. There is no such provision. But this is not all that we see reflected in section 34. When the voter has so selected from all the ballots on the ballot sheet "the ballot he intends to vote," and has changed it to suit his will, he is commanded by the section to destroy or cancel in one or the other of two particular modes every other ballot on the sheet. This shows that it was the design that the voter use only one ballot, because he is told to select one, to change that one if he wishes, and change it in a particular way, and then destroy all others. The section then closes by saying that "if more than one of said ballots have nothing on them to indicate which of them was not so voted, then neither of them shall be counted;" that is to say, if the voter does not put marks of cancellation on all the ballots except the one he selects, his vote is lost. This clause is prohibitive and mandatory. It shows further that he is to use one ballot only; all others, are to be destroyed, else he is voiceless. The voter cannot be heard through a second ballot. This closing clause goes to show it and is alone conclusive. The ballots once on the sheet have perished, except the one selected, and are as non-existent as if never printed on the sheet. If two ballots do not have the defacing marks to indicate their rejection, if two are uncanceled, the voter has not voted. How, then, can there be two ballots used by him? For want of cancellation marks the statute says they shall not be counted. The statute says that certain signs of cancellation shall be used either by drawing one or more lines with pen and ink or indelible pencil, through the heading of the ticket or "from the top to the bottom thereof," that is the ballot. Now, how can the voter draw a line partly through a ballot, leaving a name or names on it intact, when the statute tells him to draw the line clear through every name? He cannot erase a ballot in any other mode than that pointed out by the statute. Other marks have no legal significance. *Parvin* v. *Winberg*, 130 Ind. 561; *Whittam*

v. *Zahorick,* 91 Ia. 23.   And if he uses a cross or lines at the head of the ticket, or more properly speaking the ballot, the legal effect is the same as the line clear through the ballot.   The section does not provide for parts of different ballots to make up the voter's ballot.   Section 34 specifically directs, as just shown, how the voter shall prepare his ballot, and then section 57 says that he shall take his ballot sheet when handed to him by a poll clerk and go into the booth, and "shall prepare his ballot as provided in section 34."   Here is an emphatic command to follow section 34.   Thus, it seems plain that the law-makers have directed that the voter shall use only one of all the ballots printed on the ballot sheet.   As to this I have no trouble.   The only question of difficulty is, whether this direction of the statute is merely directory or mandatory.   Does disregard of it wholly reject the vote?   If the voter selects the Republican ticket, but erases the name of Wertz, and does not write in the blank space the name of Morris for recorder, but leaves his name unerased on the Democratic ballot, and erases all other names on it, or *vice versa,* is the vote null?   We have come to the conclusion that the statute is mandatory, because the mode of voting is definitely prescribed by the act, and it should be followed.   To hold otherwise we must disregard the statute.   We can answer this question only by the statute.   In the well considered and notable case of *Taylor and Marshall* v. *Beckham,* 178 U. S. 577, the unquestionable law is stated thus: "Our system of elections was unknown to the common law and the whole subject is regulated by constitutions and statutes passed thereunder."   As we have said the legislature intended only one ballot, and shall this Court repeal that statute in so grave a public matter as elections, when the legislature has been so minute and precise and detailed in this elaborate law of elections?   It was intended as, and it is, a valuable reform made to cure ills revealed by time in the most important matter connected with government, and a court ought to be cautious before frittering it away by surmising and guessing that this provision was meant, and this was not meant to be binding.   In *People* v. *Board,* 129 N. Y. 395, the court says: "The right to vote secured to the citizen by the constitution must be exercised in the manner and subject to the regulations as to time and method lawfully prescribed by the legislature."   So said this Court in the opinion in *Rader* v. *Halstead,* 27 W. Va. 808.   Cooley Con. Lim. 168, says: "The moment a court ven-

tures to substitute its own judgment for that of the legislature in any case where the constitution has vested the legislature with power over the subject, that moment it enters a field where it is impossible to set limits to its authority and where its discretion alone will measure the extent of its interference. The judiciary cannot run a race of opinion upon the point of reason and expediency with the law-making power." "And where a statute limits a thing to be done in a particular form, it includes in itself a negative, viz: that it shall not be done otherwise." 1 Kent. Comm. (5 Ed.) 467, note. Lord Mansfield's test of whether a statute is mandatory is: "Whether a statute is mandatory or not depends upon whether the thing directed to be done was of the essence of that required." *Rex* v. *Loxdole,* Burrows 44. In this case it is not only the essence of the thing that is required by the statute, but the very thing itself. Justice Thompson of the United States Supreme Court said: "Affirmatives in statutes that introduce new laws imply a negative of all that is not in the purview. So that a law directing a thing to be done in a certain manner implies that it shall not be done in any other manner." *U. S.* v. *1 Case of Hairpencils,* 1 Paine 406.

Having stated these general principles let us speak of election laws to see how far they are to be regarded as mandatory or directory. It was said in oral argument in this case, and it seems correct, that our election statute was largely taken from the Missouri statute. That statute required the voter, as we think ours does, to scratch out all the groups or columns save one, and to make all his changes on that one. A voter failed to scratch out all the columns. The court held that the statute in requiring the voter to erase all the groups and columns except one and make all changes on it, was mandatory, and if not complied with the vote should be rejected. The Missouri act said that "He shall cross out the groups he does not wish to vote." Our statute requires the voter to select his ballot which as here used means column, and erase the name of any candidate for whom he does not wish to vote, and write in the blank space below it the name of the person for whom he votes, and by mandatory language directs that every other ballot shall be defaced, and section 57 commands him to prepare his ballot as required by section 34. Our statute is as peremtpory as the Missouri statute. *Hope* v. *Flentge,* 140 Mo. 390. In my judgment this Missouri case is potential in this case. In *Kirk* v. *Rhodes,* 46 Calif. 407,

the court says: "There are, however, other requirements of the code within the power of the elector to control, and these if wilfully disregarded should cause his ballot to be rejected." Objections to the features of ballots not under the control of voters, as for instance the size and color of the paper, would be different. McCrary on Elections, s. 503, commenting on this California case, says: "The court held, and we think upon the soundest reason, that as to those things over which the voter has control the law is mandatory, and that as to such things as are not under his control, it should be held to be directory only." In *Pennington* v. *Hare,* 60 Minn. 150, the court said: "There is a clear distinction between the provisions and prohibitions in election laws which are personal to the elector, which if he violates them it is his own fault, and those which apply to the election officers, over whose conduct he has no control. In the former case they are to be construed as mandatory as a general rule and his vote will be rejected if he intentionally fails to comply with them, while in the latter case they are to be construed as directory, unless otherwise expressly or by necessary implication so declared by statute." In Little Beaver Township School Directors Election, 165 Pa. St. 237, the court said: "In so far as the mode of voting is thus specifically prescribed by the act all other modes are, by necessary implication, forbidden. *Expression unius, exclusio est alterius.* The ordinary rule, as has been expressed by recognized authority, is that where power has been given to do a thing in a particular way, then affirmative words, marking out the way, by necessary implication prohibit all other ways." In the case of *People* v. *Board,* 129 N. Y. 395, 426, the court said: "Can it be seriously contended that voters may knowingly refuse obedience to the conditions imposed by law and still claim that their votes shall be counted as lawful ballots? Such a result would transform the elaborate scheme, adopted as a reform measure, into an elaborate farce calculated only to embarrass and hamper the citizen without adding a line or word to the statute looking to the disqualification of illegal and fraudulent voters or the purification of elections." In *State* v. *McElroy,* 44 La. Ann 796, 16 L. R. A. 278, an act required the names to be printed, and a ballot from which printed names were erased and written ones inserted was rejected, because the language of the act relative to printed ballots was held to be mandatory, "the legislative intent must be

taken as expressed by the words the legislature has used." In many states the voter is not confined to one of the ballots on the ballot sheet, but he can vote for any candidate upon any ballot by marking with a cross at the place and in the manner prescribed by the statute to show the person voted for. Placing this mark is the voter's work, as under our statute is the choice of the ballot, the erasure of a name and the substitution of another in the specified blank under the erased name. In states where the voter may thus vote on different ballots many cases have arisen. In *Lay* v. *Parsons,* 104 Calif. 662, the court said: "The law requires the voter to mark his ballot by means of a stamp by putting a cross opposite the name of each candidate thereon for whom he intends to vote. This provision is mandatory, and no other method will satisfy it." In *Parker* v. *Orr,* 158 Ill. 617, the court says: "It logically follows that the voter's intention must be manifested by a cross substantially in the place designated, which the judges of elections or the court on a recount can see was an honest attempt to follow the law." In *Parvin* v. *Winberg,* 130 Ind. 564, the following propositions were laid down, and they have important import in this case: "1. A construction of the election law accepted and acted upon by the officers of election whose duty it is to administer the law should not be ignored by the courts unless it is palpably wrong." (This gives force to the construction by ballot commissioners of our act under section 44).

"3. An elector must vote in the manner prescribed by law. If an elector does not choose to indicate his choice in the manner prescribed by law, he cannot complain if his ballot is not counted."

"4. Australian System. Stamping ballot. An elector cannot indicate his choice in any other manner than by stamping one of the squares of his ballot with the stamp; and he cannot stamp his ballot elsewhere and leave the election board to guess his intention."

In *Whittam* v. *Zahorick,* 91 Iowa 36, it is held: "Whether a ballot should be counted does not depend solely upon the power to ascertain and declare the choice of the voter, but also upon the expression of that choice in the manner provided by the statute. In that respect the statute has made a radical change in the law. The only mark which is recognized as competent to express the choice of the voter is a cross, and it is not only neces-

sary to use a cross, but it must be placed at the appropriate margin or place. * * * * It is not enough that the intent of the voter is clear; it must be expressed in the manner provided by law." In *Van Winkle* v. *Crabtree,* 34 Ore. 462, it is held: "The construction of the election act generally known as the Australian Ballot Law relating to the space in which the marking of the ballots shall be done are mandatory, although there is no provision rendering void a ballot not marked in the prescribed manner." In *Martin* v. *Miles,* 46 Neb. 772, it was held that the provision of the Australian Ballot Law for the expression of the voter's intention by a mark opposite the name of the candidate is mandatory, and the manner so prescribed exclusive of all others. The court said: "Adjudications directly in point are not numerous, but the views here expressed harmonize with the decided weight of judicial expression, if indeed there exists any diversity of opinion on the subject," citing cases. The same doctrine of the necessity of complying with the statute is found in *Flynn's Case,* 181 Pa. St. 460. and *Kelley* v. *Adams,* 183 Ill. 195. In *Apple* v. *Bancroft,* 158 Ill. 649, it was held that: "The statute must be substantially complied with. To permit the voter to substitute some other method of his own of making his ballot express his choice for the one provided would practically nullify the statute. It would not only lead to uncertainty in ascertaining the voter's intention, but would destroy the secrecy of the ballot by means of distinguishing marks by which the ballot of each voter could be identified." In *Attorney General* v. *Glazer,* 102 Mich. 415, it is laid down: "Exhibit P. is rejected simply because the intent to vote the ticket is not expressed in the statutory mode, though the mark is made at the point designated by the statute. These differences of opinion are liable to arise unless the rule is adhered to that whatever marks are placed upon the ballot must be those designated by the statute and made where it indicates they should be made." In *Richardson* v. *Jamison,* 55 Kan. 16, we read that the provisions of the statute known as the Australian Ballot Law concerning the marking of ballots are mandatory, and must be substantially complied with by the voter to have his vote counted. In *Curran* v. *Clayton,* 86 Me. 53, the doctrine laid down in *Parvin* v. *Winberg,* 130 Ind. 564, is approved and the statute was held mandatory, and it is emphatically held that the voter must follow the statute. In *Vallier* v. *Brakke,* 7 S. D. 360, the court said; "There was

much discussion on the argument as to the duties of judges of election and courts to carry out the intention of the voter.. This is true to a certain extent; but as the legislature has required the elector to express his intention by certain well defined markings upon the ballot, his intentions must be determined by these markings, and not by the uncertain and undefined ideas of judges of election or courts as to his intention. The legislature has clearly and precisely defined the manner in which the elector may designate the candidates for whom he desires to vote, and has prescribed definite and fixed rules to govern the voter in designating candidates. The system is simple, and there is no difficulty in the electors complying with the rules. In our view it is neither the duty of judges of election nor courts to fritter away the benefits of the system by strained efforts to get at the intention of the voter in any manner other than by following the rules prescribed by the legislature. If the elector does not take interest enough in his vote to follow those simple rules, he can complain of no one if his vote is not counted. A system so simple and plain, and which can be comprehended by any elector of ordinary intelligence in a few minutes, must be followed."

Under these authorities I think I may ask whether the plain requirement of our statute that the voter shall select one ballot only is not mandatory; and whether that provision that he shall place a substituted candidate's name in a particular place, the blank space under the erased name, is not also mandatory; and whether that provision which requires him to erase all ballots but one by drawing a line through them continuous from top to bottom is not also mandatory. Counsel for defendants appropriately ask: "If the above enumerated provisions are not mandatory then what provisions are? If these provisions can be ignored by the voters at their mere will, what of the other provisions must they observe? If one voter can prepare his ballot in a way other than that prescribed by the statute, then every other voter can do so, and the result would be that every voter is a law unto himself and confusion worse than confounded would come about, and election officers would have no rule to pass upon the validity of a ballot, but would simply determine the result of elections by guessing, largely influenced in such guessing by party predilections or favoritism as to candidates. The whole scheme and scope of a carefully considered law making most ample, complete and particular provision as a reform

measure would be cast aside." If I am asked what harm can it do to let a voter use parts of several ballots? I will answer that there is no danger of the voter mistaking or omitting to carry out his real intent by letting him wander and grope through numerous long columns of candidates covering a large ballot sheet, than by confining him to one ballot column. His attention is then fixed and located alone upon that column. I answer further, what is of more serious consideration yet, that the officers of election at the various precincts are to go wandering over that large sheet to glean the intention of the voter, and the officers at one precinct will be of one opinion as to intent of the voter, while officers of another precinct will be of a different opinion. It introduces uncertainty; puts us at sea. But in addition to all this the legislature has written its purpose in a new law that is recognized all over the country as a great reform of the ballot, and rigid though it is, it should be enforced.

The authorities cited above afford strong warrant for holding the statute mandatory in the respect in question, testing the matter only by the face of the statute, because the letter and frame of the statute seem to look so. But when we go outside the act to the journals of the legislature to get at its intention the construction above placed upon the face of the act is strongly confirmed, is made conclusive. As the bill passed the house of delegates it contained section 34 as now found in the statute. The senate substituted another section expressly providing that the voter could vote for any candidate on any of the ballots on the ballot sheet by designating the candidates by a cross. The house of delegates would not concur in this substituted section, and the result was a committee of conference, which reported in favor of the senate receding from its amendment, and the adoption of section 34 as it passed the house, and the legislature adopted this report, thus passing section 34 as it first passed the house and as it now is. Thus the legislature refused to let voters vote any name outside of one ticket. After this statute had been some two years in force so construed by the legislature, ballot commissioners and people, the legislature re-enacted the act, but made no change in this respect.

But counsel call our attention in behalf of the plaintiff to a provision of section 66 that "any ballot, or part of a ballot, from which it is impossible to determine the elector's choice of candidates shall not be counted as to the candidate or candidates af-

fected thereby." It is argued that this shows that if the elector's choice can be seen, the ballot must be counted. Does this clause import that the voter need not use only one ballot, but may use parts of two or more? I think not. It means that when the whole of the one ballot which the voter has selected and voted is so uncertain that its intent cannot be gleaned, the whole ballot shall be rejected; and that when any part of that ballot shall be so uncertain as to a candidate, that part relating to him shall be rejected. Reflect that this clause relates only to the ballot found in the box when the count is to be made after the election. This clause never operates till then. It presupposes that there is but one ballot left on the sheet and that the others have all been destroyed. Can we suppose that the legislature, after plainly providing for only one ballot, containing all the candidates, would turn around and provide for numerous parts of ballots? Such a provision would not harmonize with the scheme of regulation prescribed by the act. If the voter has complied with the law, he has left only one ballot in the box, and that is the ballot referred to in the clause in question. That clause only says that when that one ballot is opened it must have the legal certainty required. The clause is not telling how many ballots the voter may use. Section 34 tells that before the election. This clause has a different office. It simply defines what certainty a ballot must have to be counted.

We know of the large volume of law that statutes regulating elections are frequently treated as directory, and that mistakes and irregularities should not disfranchise a voter or deprive a candidate of his vote where the purpose and intent of the voter can be ascertained. *Loomis* v. *Jackson,* 6 W. Va. 613; *Dial* v. *Hollandsworth,* 39 *Id.* 1. In answer to this I call attention to the fact that authorities say that there is a distinction in this respect between errors of officers conducting elections, and errors of voters themselves; that in the former case, as a voter has no power over the officer, that officer's blunder shall not disfranchise the voter; whereas, the voter may by his own neglect disfranchise himself. This will be seen from authorities cited above. Having just observed section 724 of McCrary on Elections, I regard this distinction sound. It says: "The weight of authority is clearly in favor of holding the voter, on the one hand, to a strict performance of those things which the law requires of him, and on the other, of relieving him from the consequence of a failure on

the part of election officers to perform their duties according to the letter of the statute, where such failure has not prevented a fair election. The justice of this rule is apparent, and it may be said to be the underlying principle to be applied in determining this question" of the mandatory or directory character of the Australian Election Law. In section 720 that work says that the provisions as to marking the ballots are mandatory. Furthermore, all authorities say that where it can be seen that it was the design of the legislature that a statute should be in any of its provisions mandatory, it must be so treated, though an election law.

Great emphasis is laid by counsel for Morris on the case of *Dunlevy* v. *County Court,* 47 W. Va. 513, (35 S. E. 956), to sustain the theory that the provisions of the statute under consideration are merely directory, and the voter must get his vote no matter how many ballots he uses, and no matter how he indicates his choice, so only that choice is clear. That case did not pass on the question involved in this case. This question was not raised in argument or discussed in the opinion except inferentially. It passed on the question how the voter's will must be manifested on one ballot, not whether he could use several ballots.

By no means do we intend to deny that the Australian law has some provisions that are merely directory. *Waggener* v. *Russell,* 34 Neb. 116; *Barber* v. *Smith,* 111 Mo. 45; *Parker* v. *Orr,* 30 L. R. A. 227. But we do say that this requirement of one ballot is not directory, and further that as the Australian system has been adopted everywhere to reform evils and defects in former election laws, and contains sedate and minute regulations for the preparation of ballots, there ought to be less disposition in the courts to evade its provisions on the theory of directoriness than in decisions on former laws, in order to effectuate the reforms contemplated.

But counsel for Morris say that if the statute in the features above discussed can be held mandatory, then it is unconstitutional, because it violates that general provision of the Constitution that "The male citizens shall be entitled to vote at all elections," etc. This is a vital clause, but only a general one. Under it the legislature would have the power vested in a state to make reasonable rules and regulations for elections, and to require voters to conform thereto. Even laws disfranchising for

failure to register have been held valid, rigid though they are, and thousands are the instances where voters' ballots have been held speechless because not conforming to law. McCrary on Elections, s. 125; Paine on Elections 294; Cooley, Con. Lim. 599; *State* v. *Black,* 54 N. J. 446. So the regulations do not disfranchise, but leaves to the voter a means of voting, though subject to a regulation with which he can comply, it is legitimate regulation. But our Constitution gives most explicit authority to the legislature, in connection with said guaranty to the voter, to make such regulations, saying: "The legislature shall prescribe the manner of conducting and making returns of elections," etc. Article IV, section 11. This not only allows, but commands, the legislature to make such regulations as said by JUDGE SNYDER in *Rader* v. *Halstead,* 27 W. Va. 808. He said very correctly that the power to regulate elections is both plenary and mandatory upon the legislature. He said that the Constitution imposed no restrictions upon this power, save that all male citizens, with specified exceptions, should be entitled to vote, and that voting should be by ballot, and that no registration should be required; but otherwise the legislature was untrammelled in the regulation of elections. These views result in the refusal of the *mandamus.*

Is the remedy by *mandamus* proper in this case? Does that writ, in election cases, lie after election where the canvassers are in process of performing their duties, but may be acting erroneously in so doing? Does it lie to compel them, during such canvas, to exercise their judgment in a particular way, to correct errors, properly remediable, by the law as it was before the election act of 1893, by *certiorari* or contested election? Does that statute apply *mandamus* to each and every act, to all duties performed by all officers under the election law, without regard to the character of the act indiscriminately? These questions were not raised in the argument of this case. The propriety of the writ was not made a question, and only the merits were argued, and the question of the propriety of the writ was impliedly waived; and so we have considered the case; but we do not wish this decision to be interpreted as passing on that point, though involved in the decision. How far the cases of *Marcum* v. *Ballot Commissioners,* 42 W. Va. 263, and *Dunlevy* v. *County Court,* 47 *Id.,* define to what particular acts of election officers the writ of *mandamus* applies is left open for the future.

*Refused.*

DENT, JUDGE, (*dissenting*):

Having much against my will been reduced to the position of dissenting member of the Court, I would like to dissent oftener than I do, were it not for waste of time that can be more profitably used, the pressure of other duties and the fear of being too captious and critical. Therefore I studiously avoid doing so. But sometimes the conclusions of my worthy associates are so palpably wrong, their construction of law so subversive of truth and right, and their reasoning so unsound and fallacious, that it would require a much more stocial disposition than mine to remain silent under the torture inflicted by their departure from the fundamental principles of justice. In the present case, while protesting that it is flagrantly wrong to do so, they deliberately proceed to amend the election statues to suit the peculiar exegencies of this litigation. They enact law *ex post facto* and seek to cast the stigma thereof upon the legislature, and berate the disfranchised voter for his stupidity and ignorance in disregarding it. They do this after much study, with the eloquent assistance of astute counsel, of a statute which they pronounce so plain that only the most simple need err as to its mandatory character. After most profound and earnest consideration they make the law to read: "A voter must use only one of the ballots of the election ballot sheets and the names of all the candidates for whom he votes must be found on that one ballot. IF SOME NAMES ARE ON ONE BALLOT, AND SOME ON ANOTHER, THE VOTER DOES NOT VOTE FOR ANY CANDIDATE." If such a provision were in the statute this litigation would never have arisen. The most critical examination will not find it there. If the legislature had intended it to be there it could have said so in just as plain and unmistakable language. The fact that it did not do so is the best and conclusive evidence that it did not so intend. To hold otherwise is to convict the legislature either of imbecility or a fraudulent purpose to construct a trap for unwary voters. The latter could not have been the case, for the legislatude could not foreknow the result of the election, or that the courts would spring such trap at the proper time. The law which is so badly misconstrued and amended by the Court, reads as follows:

"The names of all candidates nominated by each political party respectively, shall be printed on the ballots in columns.

* * * At the head of each column of political party nomina-
tions shall be printed in clear, bold type, the name of the polit-
ical party (or principle) which the candidates represent, as con-
tained in the certificates of nomination; and sub-headings may
be placed over each group to indicate the political division for
which the respective groups are to be elected.    Immediately
after the name of each candidate there shall be left a blank space
between that and the next name or whatever is printed thereon,
at least one-half inch.    A voter desiring to erase the name of any
candidate from the ballot he intends to vote or to vote for any
other candidate or person in his stead may strike out the name
so printed on said ballot and write in the blank space next fol-
lowing the name of the candidate or person for whom he desires
to vote.    But if he fails to strike from said ballot the name
printed thereon, the name written in said blank shall alone be
counted as to said office.    The several ballots to be voted at
any election shall be printed side by side on the same sheet of
paper, the democratic ballots on one side thereof and the repub-
lican ballots or the other ballots, if any, between them with one
black line between each of them and all candidates or persons
voted for by any voter shall be those whose names are printed or
written as aforesaid thereon; and every other ballot on the same
sheet shall be defaced by drawing one or more lines with pen
and ink or indelible pencil from the top to the bottom thereof,
or across the heading thereof, or in any other way indicating that
the same has not been voted by the voter.    But if more than
one of said ballots have nothing on them to indicate which of
them was not so voted then neither of them shall be counted."
Section 34, chapter 3, Code. "On receipt of his ballot the voter
shall forthwith and without leaving the enclosed space, retire
alone to one of the booths or compartments provided for the
purpose and shall prepare his ballot as provided in section 34 of
this chapter."    Section 57.    "If two or more ballots be found
folded or rolled together and the names thereon be the same,
one of them only shall be counted; but if the names thereon be
different in any particular, neither of them shall be counted
except as hereinbefore provided, and in either case the commis-
sioners of election shall in writing in ink, place a common num-
ber on said ballots and state thereon that they were folded or
rolled together when voted.    If any ballot be found to contain
more than the proper number of names for any office, such ballot

shall not be counted as to such office. In any election for sena-
tor if a person be voted for on any ballot who is not a resident of
the proper county, as required by the fourth section of the 6th
article of the Constitution, such ballot shall not be counted as
to such office.

"Any ballot which is not endorsed with the name of the poll
clerks as provided in this chapter shall be void and shall not be
counted; and any ballot or part of a ballot from which it is im-
possible to determine the elector's choice of candidates shall
not be counted as to the candidate or candidates affected there-
by."

In the election law the word ballot is used to designate three
things: First, most often to denote the sheet of paper on which
the true ballots are printed; second, the political columns in
which the separate and true ballots are arranged, and third, the
true ballots being the separate designation of each office and
candidate which the voter casts and which alone is counted.
Neither the sheets nor columns but the separate ballots in the
sheets and in the columns are alone counted.

In the 34th section, as quoted, the word ballot is used indis-
criminately for all three purposes.

In the clause that "the names of all candidates nominated by
each political party respectively shall be printed upon the ballots
in the columns" the sheets are meant. In the sentence " a voter
desiring to erase the name of any candidate from the ballots he
intends to vote or to vote for any other person or candidate or
person in his stead may strike out the name so printed on said
ballot and write in the blank space next following the name of
the candidate or person for whom he desires to vote," the word
ballot may be either construed to mean the column or the true
ballot for the purpose of effecting the intention and preserving
the voter from disfranchisement. My learned associates give it
the former meaning thereby effecting the disfranchisement of
the voter.

In the sentence "but if he fails to strike from said ballot the
name printed thereon the name written in said blank shall alone
be counted as to said office." The words ballot may be inter-
preted in the same manner to suit the views and purposes of the
expounder so as to preserve or reject the votes involved.

In the clause, "the several ballots to be voted at any election

shall be printed side by side on the same sheet of paper, the Democratic ballots on one side thereof, and the Republican ballot on the other and the other ballots, if any, between them with one black line between each of them and all candidates or persons voted for by any voter shall be those whose names are printed or written as aforesaid thereon." The word ballots undoubtedly is used to designate according to its true meaning the separate offices and candidates to be voted for and not either the sheet or column.

In the following dependent clause, "and every other ballot on the same sheet shall be defaced by drawing one or more lines with pen and ink or indelible pencil from the top to the bottom thereof" (meaning the sheet) or across the heading thereof or in any other way indicating the same has not been voted by the voter. The word ballot to render the law consistent should be construed to mean the same thing as the word ballots used in the former clause and that is the true ballot and not the separate political columns, especially if thereby the voter is preserved from disfranchisement. In the final sentence of the section, "but if more than one of said ballots had nothing on them to indicate which of them was not so voted, then neither of them shall be counted." The word ballots can possibly be construed to mean the separate columns, but from the context the true construction thereof would be that if the voter failed to make clear his vote for any office by striking out or erasing from the ballot sheet all the ballots for a specified office, except one, his ballot for such office should not be counted. As said before the only matter of count is the separate ballots for each office and not the columns and ballot sheet, although all the ballots in a column or on the ballot sheet may be rejected for the reason that the voter by proper erasures has failed to make his intention clear.

From a careful consideration of this section as a whole it is plain that the legislature left the preparation of his ballot or ballots entirely under the control of the voter with the simple mandatory requirements that "all candidates or persons voted for by any voter shall be those whose names are printed or written as aforesaid thereon," (meaning the ballot sheet) "and that all of the names of all other candidates should be erased in any way indicating the same has not been voted by the voter," and that it was not the intention of the legislature to mandatorially require the voter to mark his ballot sheet in any particular man-

ner so he made his intention plain. The simplest way for a well informed voter to vote is to strike out all the columns on the ballot sheet except the one selected by him and make such changes of the ballots in that column that he may see fit. But this is not made a mandatory matter by the statute, but is left thereby to the discretion of the voter, provided he makes his intention plain by proper erasures. The controversy between the house of delegates and senate referred to by my associates, as I am informed, and as the enactment shows, was not as to whether the voter should be confined to a single column, but whether he should be required to indicate his vote by the erasures of all candidates not voted for or in some manner designate the candidates voted for, one being the negative and the other the affirmative mode of voting. The house of delegates prevailed, as presenting the simpler method of voting for the voter and the negative method was adopted with directions to the voter as to the preparation of his ballot, yet allowing him the privilege of making changes in his own way so he made his intention plain on the face of the ballot sheet.

In the sentence quoted from the 57th section, "on receipt of his ballot the voter shall forthwith and without leaving the enclosed space, retire alone to one of the booths or compartments provided for the purpose and shall prepare his ballot as provided in section thirty-four of this chapter." The word ballot means ballot sheet. This is made conclusive by the preceding section which provided that each voter shall be entitled to and the poll clerks shall deliver him one and only one ballot." After receiving which he shall prepare it as provided in section thirty-four, that is according to the negative way of voting by indicating thereon the candidates he does not vote for and thus indicating the candidates he does vote for without affirmatively doing so.

In the first sentence of section 66, as quoted, "If two or more ballots be found or rolled together, etc.," the word ballots means ballot sheets.

In the second sentence, "if any ballot be found to contain more than the proper number of names for any office such ballot shall not be counted as to such office." The word ballot undoubtedly bears the same meaning as in the preceding sentence, that is ballot sheet, although it is possible to construe it to mean either a column or a designation for a single office according to

the standpoint of the expounder and the end he may have in view.

So it may be said as to the word ballot used in the third sentence.

And in the fourth sentence, "any ballot which is not endorsed with the names of the poll clerks as provided in this chapter shall be void and shall not be counted; and any ballot or part of a ballot, from which it is impossible to determine the elector's choice of candidates shall not be counted as to the candidate or candidates affected thereby." The word ballot cannot be otherwise justly and truthfully construed to mean anything else than the ballot sheet. Any other construction does violence to the plain intention of the legislature to provide for the inadvertent mistakes of uninformed voters and prevent the counting of ballots for any office where the intention of the voter was not made plain and thus negatively to require the counting of all ballots or parts of ballots for any office when from such ballot or part of ballot it was possible to determine the elector's choice of candidates. This section dealing with the ballot sheets as taken out of the ballot box and directing when they should not be counted is the proper section in which the legaslature could have provided that no ballot should be counted if the elector used two or more of the separate columns of ballots to indicate his choice of candidates for the various offices. The fact that the legislature did not so provide is conclusive that it did not intend that such should be the law. The legislature was not interested in defeating but to its glory was seeking to preserve the right of suffrage to each voter, if his intention was plainly indicated in his own method on the face of the ballot furnished him. In doing so it was carrying out the fundamental principles of free suffrage as established by the former decisions of this and other tribunals. My worthy associates in avoidance of the true effect of the provisions of section 66, indulged in the violent presumption that this section does not deal with the ballot sheet, but only with the ballot column when properly prepared by the voter under section 34, and that the ballot sheet as such has ceased to exist in contemplation of the legislature. To arrive at such a conclusion their examination of this section must have been quite cursory for it is perfectly apparent that the purpose of the section was to deal with imperfect ballot sheets found in the ballot box and indicating which of them and what parts

thereof should be counted by negatively determining which of them should not be counted. No place does it negatively or affirmatively appear in the statutes that the ballot sheet or ballot column or any parts thereof or any of the true ballots should be rejected from the count if the elector's choice of a candidate for any office can possibly be determined from the face therof. If it did so appear the necessity of amending the statutes by the Court would not have presented itself. But it does plainly appear what ballot sheets, what ballot columns and parts thereof and what ballots shall not be counted as to any office because they fail to express the choice of the voter as to such office, and thereby negatively the duty is made mandatory on the election officers to count every ballot sheet, every ballot column or part thereof and every ballot from which it is possible to determine the choice of the elector of the candidates for any office. This was the conclusion reached in the case of *Dunlevy* v. *Davis,* 47 W. Va. 513, 35 S. E. 956, and this is the conclusion that should prevail in this case for it is of the fundamental principles underlying popular elections sustained by reason and authority that "effect should be given to the intention of the voter as depicted on his ballot, even though the expression of that intent might be in some degree irregular unless the irregularity violates some fundamental principle of the secret ballot or is expressly declared *by law to be fatal to their vote.*"  *Gunn* v. *Hubbard,* 97 Mo. 311; *Brown* v. *McCullum,* 76 Iowa 479; *Loomis* v. *Jackson,* 6 W. Va. 613; *Dial* v. *Hollandsworth,* 39 Va. 1; *Dunlevy* v. *County Court,* cited. The legislature would never declare "if some of the names are on one ballot, some on another, the voter does not vote for any candidate," although his intention be perfectly plain. It would certainly give effect at least to the ballot containing a majority of the names voted for, although it reject all the others. There is no sound reason why the voter should lose his whole vote because he leaves a name unerased in a column different from that selected by him to represent the main part of his vote and the Legislature nowhere makes such provision. On the contrary it has negatively provided that a ballot or part of a ballot from which it is possible to determine the elector's choice of candidates shall be counted for the candidate or candidates affected thereby.

It must be admitted that there have been numerous departures from the rule stated above and the intention of the voter

has been sometimes wholly ignored by the courts. But such decisions when critically examined will be found to be the result of political bias and should have but little weight as precedents.

Such bias arises from the frailty of human nature. From it no one is entirely free although sometimes the unconscious victim thereof may deceive himself into the belief of absolute free dom therefrom. It affects the moral conscience and renders it weak and vascillating when it should be strong and stable. The person who is the slave thereof deserves our pity as well as condemnation for a fellow feeling or rather failing should make us wondrous kind.

It is this bias that murdered Socrates in the name of the state for the protection of youth, betrayed, mocked, and crucified Christ for the preservation of Israel, and established and sustained the Spanish inquisition, that pure and undefiled religion might be maintained on the earth.

To-day it repudiates and execrates all these evil deeds of the past while engaged in repeating them to the great injury and execration of generations yet unborn. For the evil that men do live after them, though extolled at the time as virtuous, to mock their day and generation and may at some time return to haunt them, as it is written that every man shall be rewarded according to his works. Men dread to charge others with such bias through fear of being their own accusers and yet a sound public sentiment is the only proper corrective thereof. *Hope v. Flentige*, 140 Mo. 390, the principal authority relied on to sustain the opinion and conclusions of the Court is a case of this character. Its political bias is plain, although the judges, as is usual in such cases, fortified their consciences behind the mandatory character of the statutes under consideration and placed the blame for the injustice produced by their adjudication on the ignorance or carelessness of the unfortunate voters whom they disfranchised without regard to the candidate who loses his office and the people who lose the officer of their choice. The case was decided by a majority of one in a court of seven, three of the judges including the chief justice, dissenting. The judges were Democratic and the votes rejected Republican for Republican officers. Such decision becomes a precedent that enables courts who are inclined to do so to disfranchise thousands of electors and change the result of elections throughout the United States. In this way the wrongs committed unwillingly by one set of judges furnish

justification for greater wrongs committed by another until a healthy and aroused public sentiment causes a correction by positive law of the mistaken adjudications of the courts.

These four judges, however, had a much more clearly mandatory statutory provision behind them than is contained in the election statutes of this State. The Missouri statute positively directs the voter to *cross out all the groups on the ballot he does not wish to vote,* and then make all changes on one group by striking out the name or names of candidates he does not wish to vote for and write the name or names of his choice underneath, *so that the remaining part shall express his vote."*

There are no such positive directions in our statute and the Missouri statutes does not permit the voter to deface a ballot in "any other way indicating that the same has not been voted by the voter." Nor does the Missouri statute contain a provision negatively requiring the election officers to count any ballot or part of a ballot from which it is possible to determine the elector's choice of candidates for any office. Had these provisions and any others heretofore commented on been contained in their statute that court would hardly have disregarded the plainly expressed intent of the voter. Certain it is that when the legislative intent is doubtful and men learned in the law differ with regard thereto the ordinary voter should be given the benefit of the doubt and this Court is not justified in making such doubtful statute positive and mandatory to the disfranchisement of numerous voters and the defeat of the will of the people in their choice of candidates.

In all cases of doubt the will of the people should prevail.

There is no question but what *mandamus* is the proper remedy to compel a board of canvassers to count all legal ballots. The discretion exercised by them is purely ministerial and not *quasi judicial,* and it may be controlled by *mandamus.*

This question has heretofore been firmly settled by this Court and it is hard to understand why the opening of it anew should be now suggested. While this is true there is no doubt, but what the writ was prematurely applied for in this case, for it ought not to issue until the canvassers have completed the canvass so as to establish the right of the relator to the writ. The completed canvass may render the writ unnecessary or demonstrate its uselessness. 13 En. Plead. & Prac. 677, 678. This, however, could be obviated by filing an amended petition after the inchoate right

became perfect. The *mandamus* should then be made absolute and peremptory.