# CHARLESTON.

The Webster Lumber Company *v.* The Keystone Lumber and Mining Company.

Submitted June 25, 1901. Decided March 15, 1902.

1. Title to Chattles—*Record of Reservation—Possession Necessary.*

Section 3 of chapter 74 of the Code, requiring notice of a reservation of title to goods and chattels sold upon condition precedent to be recorded in the clerk's office of the county court of the county where the property is, does not apply, unless possession of the property be delivered to the buyer. (pp. 552, 553).

2. POSSESSION—*Structure on Real Estate.*

  When the property so sold is a structure upon the real estate of the vendor, capable in its nature of being made a fixture, and it is agreed between the parties that it shall not be removed until paid for, there is no delivery of possession although the buyer, as tenant or licensee upon the land, has the use of such property.  (pp. .554, 555).

3. SALE—*Possession—Equitable Relief.*

  The W. L. Company, being the owner of a tract of timbered land, contracted with the owner of a mill to saw the timber and with W. & M. to log it.  By the original contract W. & M. were to construct a railroad on the lands of the company, at their own expense, for the logging of the timber, but finding themselves unable to buy the materials, the W. L. Company bought and paid for them and had them shipped to the land in its own name and laid down by W. & M. with the understanding that they were to be and remain the property of the W. L. Company until paid for by W. & M.  After the road was thus completed the new contract was reduced to writing and it was therein stipulated that the W. L. Company was to hold and own all materials purchased by it in its own name until further transfer by a sufficient bill of sale therefor.  W. & M., becoming indebted to the K. L. & M. Company, said company in an action at law attached the railroad and had it sold as the property of W. & M., at which sale it became the purchaser, *Held:*  That although there was a sale of the railroad materials by the W. L. Company to W. & M. there was not a delivery of the possession thereof to the buyers, and, although no notice of the reservation of the title was recorded, the K. L. & M. Company acquired no title to the materials by its purchase, and equity would enjoin it from removing them.  (pp. 557, 558).

From the Circuit Court, Webster County.

Upon petition of the Webster Lumber Company an appeal and *supersedeas* was allowed.

*Affirmed in Part.  Reversed in Part.*

HENRY M. RUSSELL and W. W. BRANNON, for plaintiff in error.

W. MOLLOHAN and W. E. R. BYRNE, for defendant in error.

POFFENBARGER, JUDGE:

The Webster Lumber Company, a West Virginia corporation, being the owner of a tract of land situated in Webster County and containing about four thousand acres, having upon it a large

amount of timber, contracted with one person or firm to saw this timber, and on the 22nd day of October, 1895, entered into a contract with Joseph L. Wheeler and Harry A. Miller, by which said Wheeler and Miller agreed to construct a standard guage railroad from a point near Glade Station, on the West Virginia Central and Pittsburg Railroad, up to the timber standing on the company's land, at their proper cost and expense, and all roads and tramways through said tract of land necessary to the removal of the timber therefrom, and also to furnish at their own expense all necessary appliances, locomotives, tools, trucks, etc., needed to operate said railroad. They were to have, free of charge, all rights and privileges necessary to construct and operate the railroad in delivering the timber at the mill. They agreed to cut, fell and deliver all the timber on that tract of land to the mill-dam to be located near Glade Run Station, cleaning up all the saw timber as they should go. They were thus to deliver logs to make not less than thirty thousand feet of lumber for each working day, for at least eight months in the year, or a total of not less than five million feet annually, until the timber should all be taken off the land, unless prevented by accident, strikes among men or other causes over which they could have no control. For this service Wheeler and Miller were to receive four dollars and fifty cents for each one thousand feet of timber, except the beech, birch and maple and, for each one thousand feet of beech, birch and maple that they should cut and deliver as aforesaid, they were to have four dollars. The contract contained a provision by which in case the Webster Lumber Company should fail to find a market for the sale of their timber and thus render it impossible for Wheeler and Miller to continue their operations under the contract and they should desire it, the Webster Lumber Company might purchase the railroad, its equipments, appliances and all the improvements necessary for the cutting and removal of said timber in the manner and upon the terms set forth in the contract. It also contained a clause by which the lumber company bound itself to furnish enough timber to make thirty-five million feet of timber. If so much could not be found upon the tract of land mentioned they were to make up the timber from other lands near said tract.

Under this contract Wheeler and Miller began the construction of the railroad soon after the contract was made. Along in

December, 1895, as stated by the president of the Lumber Company, Miller, whose deposition is not taken in the cause, began writing letters to the president of the company, who was also vice-president of a National Bank at Connellsville, Pennsylvania, wanting to know if Wheeler and Miller could not borrow some money from that bank. The bank refused to make the loan, and Miller went to Connellsville and told the officials of the company that, unless the company would buy the rails, splice bars, spikes and ties and put them in the road, it would be impossible for them to go on with their contract. Mr. Kilpatrick, president of the company, says they told Mr. Miller they would not buy the rails and the material for them, and that, if they did buy them at all, the purchase would be made for the company, and that finally it was agreed between Miller and the company that the company would buy the material, necessary to complete the road, at its own cost, and would own the material until such time as Wheeler and Miller would be able to buy it from them. Wheeler and Miller were to pay a rental of fifty cents per thousand feet on the timber they should deliver and also to pay the interest on the money to be invested in the materials, the rental to be deducted from the money to become due them for the timber cut and delivered at the contract price. This occurred in January, 1896, and, at the time of the making of this arrangement and agreement, the company gave Mr. Miller four hundred dollars to be used in the purchase of ties for the road, the receipt for the payment of the ties to be taken by Wheeler and Miller in the name of the Webster Lumber Company, and the money was so expended and the receipts taken. Afterwards five hundred dollars more was paid by the company to them and used in the same way. These two items are carried into the accounts between the lumber company and Wheeler and Miller in such way as to leave it uncertain as to the exact nature of the transaction. Kilpatrick and J. B. Balsley, secretary of the company, attribute that to the carelessness or incompetence of their bookkeeper. There is no doubt whatever that the money was paid and handled in the manner stated by Kilpatrick. Wheeler was put upon the stand as a witness against the company and admitted that the money was received and expended in that way. All the rails and other materials that went into the road were purchased by and in the name of the Webster Lumber Company. They were consigned to the company. The com-

pany purchased them, but Kilpatrick gave his personal guarantee that they would be paid for by the company. They were paid for by the company. These materials were all placed in the road by Wheeler and Miller by February 15, 1896.

The rolling stock of the road consisting of a locomotive, some log trucks or cars, and all the other tools used by Wheeler and Miller, were purchased by them. The company furnished no money for that purpose. The engine and cars cost five thousand six hundred dollars, on which Wheeler and Miller paid one thousand five hundred dollars or two thousand dollars cash, and the balance of the purchase-money was secured, by articles of agreement reserving title to the property until the performance of the conditions, in respect to payment of the purchase-money, in the form or nature of rental rates.

On the 19th day of August, 1896, a new contract was made, reciting the inability of Wheeler and Miller to comply with their agreement of October 22, 1895, in respect to the purchase of the rails, ties, and other materials for the construction of the railroad, and the investment by the Webster Lumber Company of seven thousand eight hundred and seventy-four dollars and fifty-two cents in said materials, in consideration of which it was understood and agreed that Wheeler and Miller should be paid only the sum of four dollars per thousand feet for the timber stocked, except beech, birch and maple, and three dollars and fifty cents per thousand feet for the beech, birch and maple, being fifty cents less on the thousand for each kind than was provided by the original contract; that no part of the track should be removed from the section in which it was until the lumber company should be satisfied that their interests there had been fully developed; and that Wheeler and Miller were to pay to the lumber company six per cent. interest on the sum of money so invested and when the total amount of timber at fifty cents per thousand and the interest paid should amount to the money invested by the lumber company, a good and sufficient bill of sale for the railroad should be made to Wheeler and Miller. An explanatory clause of the agreement is to the effect that the fifty cents per thousand feet should be charged as rental for the property purchased by the lumber company until such time as Wheeler and Miller's credit for rent and interest should aggregate the amount invested by the lumber company, and all moneys deducted prior to the date of the agreement were

to be considered rental for the rails purchased and when the rental and interest should amount to the total sum invested by the lumber company, this agreement was to become void and thereafter four dollars and fifty cents and four dollars respectively, should be paid for stocking timber, as set forth in the agreement of October 22, 1895. The last clause reads as follows: "And it is understood and agreed that said party of the first part is to hold and own all materials purchased by them in their own name until full transfer to said parties of the second part has been executed according to the terms herein set forth."

Wheeler and Miller became involved in debt and the Keystone Lumber and Mining Company brought an action of *assumpsit* in the circuit court of Webster County against them, in which an attachment was issued and levied upon the railroad, including the road-bed, right of way, the metal rails, cross-ties, fish plates, bolts, spikes and all other parts of the road and also upon the rolling stock and other property of the defendants. In this action, the Keystone Lumber and Mining Company recovered a judgment for one thousand nine hundred and seventy-four dollars and thirty-seven cents, and the court ordered a sale of the railroad and the locomotive and the logging trucks, and appointed W. E. R. Byrne to make such sale. As to the locomotive and logging trucks, the Lima Locomotive and Machine Company consented to the sale, but the proceeds of said last mentioned property were to be held subject to the future order of the court, and the Lima Locomotive and Machine Company was granted leave until the next term to file its petition and show such claim as it might have to said proceeds or any part thereof. The order of sale was executed on the 4th day of May, 1897, and at the sale the rolling stock was purchased by the Webster Lumber Company and the railroad by the Keystone Lumber and Mining Company. The locomotive was sold first and then the trucks were sold. Before the railroad was sold the Webster Lumber Company, by Kilpatrick, its president, gave notice to the commissioner and to the public, by proclamation, that it claimed the railroad as its own property, and that it would hold and defend such property. The following written notice was read to the public and to the commissioner and then handed to the latter:

"To Commissioner Byrne and the public at large:

"You are hereby notified that the property now being offered

for sale as the property of Harry A. Miller and Joseph A. Wheeler, partners as Wheeler & Miller, is the property of the 'Webster Lumber Company,' and that the Webster Lumber Company hold articles of agreement and deed for the right of way, dating back to the year 1895, and that they purchased all the material for said road, for which they have bills and receipts, in the name and for the Webster Lumber Company, and you are all hereby notified and warned that we will hold and defend said property to the full extent of the law. Webster Lumber Company, per Worth Kilpatrick, President."

After said sale the Webster Lumber Company began using the railroad, and the sale was not confirmed until the 5th day of August, 1897. The order confirming the sale directed 'that possession of the railroad be delivered to the Keystone Lumber and Mining Company, by a writ to be issued for that purpose. A copy of the order was made and certified and delivered to the deputy sheriff of said county and, on the 16th day of August, 1897, he went to the Superintendent of the Keystone Lumber and Mining Company, and informed him that the railroad was then the property of his company and directed him to take charge of it. He also went to the Superintendent of the Webster Lumber Company and notified him to exercise no further control over it and not to use it. Whether this order was obeyed by the Webster Lumber Company is not entirely clear, but there is no evidence that the Keystone Lumber and Mining Company ever occupied or in any way made use of the railroad. It is also certain that if the Webster Lumber Company did cease to use it such cessation was for the period of not more than one week.

On the 9th day of August, 1897, the Webster Lumber Company presented its bill in equity to the judge of the circuit court of said county, who granted an injunction, restraining and inhibiting the Keystone Lumber and Mining Company from suing out a writ of possession or writ for the possession of the Webster Lumber Company and from disturbing its possession therein in any manner whatever. The Keystone Lumber and Mining Company filed its demurrer and answer to the bill, and such proceedings were had that on the 9th day of August, 1899, the cause came on to be heard upon the bill and exhibits, the demurrer and answer to the defendant and general replication to the answer, exhibits filed with the answer, former orders and

decrees, deposition for the plaintiff and the defendant and exhibits and affidavits filed, and a final decree was made and entered.    By this decree, it was determined that the rolling stock, cross-ties, spikes, splices, and other materials used in the construction of the road were not the property of the Webster Lumber Company; that the contract of August 19, 1896, was a conditional sale of said materials, and was void, as to the attaching creditor, because it had not been recorded in pursuance of section 3 of chapter 74 of the Code; that, by virtue of the sale under the attachment, the Keystone Lumber and Mining Company became the owners of the materials in said road and that it should have a reasonable time in which to remove said materials, which time was given in the decree.    The injunction was, therefore, dissolved.    Upon the petition of the Webster Lumber Company, complaining of this decree, a judge of this Court allowed an appeal and *supersedeas.*

There is but one question in the case and that is whether, as to the railroad, except the road-bed, there was a sale by the Lumber Company to Wheeler and Miller, such as is contemplated by section 3 of chapter 74 of the Code.    The portion of that section which is said to apply reads as follows:  "And if any sale be made of goods and chattels, reserving the title until the same is paid for, or otherwise, and possession be delivered to the buyer, such reservation shall be void as to creditors of, and purchasers without notice from such buyer, unless a notice of such reservation be recorded in the office of the clerk of the county court of the county where the property is."

In order to determine whether there was a conditional sale, in this instance, so as to make this property, by virtue of said statute, the property of Wheeler and Miller, as regards their creditors, it becomes necessary to inquire whether all the conditions mentioned in that statute have been complied with.    Was there a sale?    Was it a sale of goods and chattels?    Was there a reservation of title?    Was possession delivered to the buyer? These questions must be answered upon the following facts as well as upon the terms of the contract:    At the time the materials were paid for by the lumber company they were mere chattels. .    They were put into the railroad long before the contract of August 19, 1896, was made.    They were purchased and put into the railroad under a verbal contract between the parties by which it was expressly understood to be the property of the lum-

ber company until paid for by Wheeler and Miller. These materials were shipped to the Webster Lumber Company, at the place at which they were to be used. Wheeler and Miller were permitted to put them into the road. Said materials were all put upon land belonging to the Webster Lumber Company, part of that land being only a strip wide enough for the construction of the railroad through the land of one H. S. Kunst about a mile long and running from the mill out to the land of the lumber company.

It cannot be doubted that there was a contract of sale between the parties. In that contract there is undoubtedly a reservation of title, for the railroad was not to become the property of Wheeler and Miller until fully paid for in the manner specified in the contract of August 19, 1896. But this is not enough to make the property liable to creditors as the property of Wheeler and Miller. Before it could become so liable possession must have been delivered. If there was any delivery of possession, when did it occur and how? It cannot be reasonably contended that the contract of August 19, 1896, passed the possession of the property, for it was upon, and attached to, the real estate of the lumber company and clearly intended, by both parties, not to be detached or removed until all the timber on the land should be stocked. As regards possession, that contract shows upon its face that possession was not to be delivered, or rather that possession was not delivered. In that respect the contract was executory, for it provides that thereafter upon full compliance with its terms by Wheeler and Miller a bill of sale would be executed by the lumber company. Why was that? To assure Wheeler and Miller that upon full payment they might take up and remove the railroad and have possession of it. At the time the contract was made the materials had gone into and become a part of a structure upon the land of the lumber company, and there is no evidence of any act done at that time, affecting the status of the property, except the mere execution of the contract. The property was such, it is true, that manual delivery of possession could not be made. But looking to the terms of the contract, it is seen that it was not the intention of the parties that any change should be made in the control of the road until after payment should be made. At that time, the road was upon the land of the lumber company and it was beyond the power of Wheeler and Miller to remove it from the land or to do

anything with it except to use it upon the land of the Webster Lumber Company for the purpose of stocking its timber. That is what it was built for. It was built and put upon the land practically at the expense of the Webster Lumber Company. That company did not buy nearly eight thousand dollars' worth of material and unqualifiedly deliver it into the possession of Wheeler and Miller. It purchased these materials and had them shipped to its own land and in its own name, to be built into a railroad for the handling of its own timber, and permitted Wheeler and Miller to do nothing more with them than merely take them from the cars and put them down into the road. This was all done before the contract of August 19, 1896, was entered into. From the time that was done until the contract was entered into, Wheeler and Miller had no right or authority to remove these materials from the land. During that time the materials were within the control, so far as possession is concerned, of the Webster Lumber Company, because they could not be removed from the land without its permission. A court of equity would have been quick to enjoin the taking up of that railroad by Wheeler and Miller, not because the purchase-money had not been paid, not simply because its removal would have been in violation of the contract, to log the timber, resulting in irreparable injury to the lumber company, but because the railroad was on the land of the lumber company and the materials had been purchased and paid for by it, and had not passed out of its possession. That being the status of the property in respect to possession, it was not changed by the contract of August 19, 1896, for, in that contract, there is not a word, a line or a clause, conferring upon Wheeler and Miller the right to remove a rail or a tie of it from the land. By its terms, their right to change its position on the land is restricted and qualified.

A structure put upon a man's premises at his own expense and used by a mere licensee cannot be taken off of the premises, in the absence of an express agreement giving authority so to do, and it cannot be said to be out of the possession of the land owner or in the possession of the licensee, within the meaning of the statute here relied upon. "By the possession of a thing we always conceive the condition in which not only one's own dealing with the thing is physically possible, but every other person's dealing with it is capable of being excluded." Bouvier's

Law Dic., Possession.   Property upon a man's land, and especially property annexed to the land, a structure, which cannot be removed without the consent of the land owner, cannot be held to be beyond his possession.

The principal question argued in this case is whether the railroad in question is real or personal property.   The doctrine of fixtures is one which has given the courts much perplexity and the decisions on that question are numerous, but no case has been found which stands upon the state of facts presented here. It is true, that this road was constructed for the purposes of trade and generally such structures may be removed by the tenant or licensee and for that reason they are considered not a part of the realty but personal property, although the same structures put upon the land for a different purpose, namely, with the intention of making them permanent, would be annexed to, and become a part of, the realty.   Kerr on Real Prop., s. 135, and numerous cases there cited.   These principles apply in the absence of any special agreement between the parties. But the agreement of the party supersedes the law.   "When there is a special agreement between landlord and tenant regarding fixtures, that overrules and supersedes the general rules of law regulating their mutual rights and obligations."   *Wall* v. *Hines,* 64 Am. Dec. 64, 4 Gray (Mass.) 256.   "It is a well settled rule of law that the parties between whom the question as to fixtures arises, may, by express agreement, fix upon chattels annexed to realty whatever character they may have agreed upon. Property which the law regards as fixtures may be by them considered as personalty, and that which is considered in law as personalty they may regard as a fixture.   Whatever may be their agreement in this respect the court will enforce, as between themselves."   Kerr on Real Prop., s. 144.   "The agreement of the parties supersedes the law, and is binding alike upon the original parties and subsequent mortgagees or purchasers with notice."   Idem. s. 144.   Under the head of Limitations of this rule the same author says, in section 145, "In the third place, such agreements are invalid as against the rights of the third person, as *bona fide* purchasers of the land."   The only other qualifications he puts upon the doctrine are, that the property must be such as is capable of becoming personal property, that such agreements are subject to the statute of frauds.   It is nowhere intimated in his work that such an agreement would

not be binding upon an execution creditor of the tenant or licensee. In a case somewhat similar to this the Supreme Court of Indiana said: "Proceeding now to the question whether the engine and mill fixtures were real or personal property, it may be asserted that if Risinger would have been entitled to remove these fixtures from the premises of Dorsh, during the term of his right of occupancy of the premises, they would, as between Dorsh and Risinger, be personal property; and if personal property as between them, they might be liable to·be taken on execution against Risinger, the. owner of them, though the execution was a joint one against Risinger and others." *State ex rel,* v. *Bonham,* 18 Ind. 231.

In disposing of this case it is not necessary to go so far as does the Indiana court, nor to hold absolutely that the railroad in question became a part of the realty. This case must stand upon its own facts. The property in question was bought and. paid for by the owner of the land and caused by it to be put upon its own land. In all these cases in which tenants and licensees are permitted to remove structures put upon land for the purposes of trade, such structures are built by the tenants and licensees. Such is not the case here. It is true that Wheeler and Miler graded the road-bed, but it cannot be said that by so doing they acquired the real estate, the ground itself. That part of the road concededly belongs to the lumber company, notwithstanding the fact that Wheeler and Miller graded it. All the balance of that railroad, except the labor and expense of laying it down, was furnished by the Webster Lumber Company. Not a rail nor a tie of it was paid for by Wheeler and Miller. They laid the Webster Lumber Company's materials upon the ground in the form of a railroad upon its own ground under an express, verbal agreement that that railroad was the property of the Webster Lumber Company and would remain so until they should pay for it. To say that under such circumstances that railroad did not become a part of the realty, if the Webster Lumber Company desired that it should be such, subject only to be converted in the future into personal property by the purchase of Wheeler and Miller, would be carrying the doctrine of fixtures beyond the limits of any case yet noted or any principle laid down in the books. Under such circumstances it would be conforming to reason and not violating any principle of law to hold that the railroad is a fixture and a part

of the realty.   It is true there is a contract under which, upon compliance with conditions, it may be removed.   But it never can be removed by Wheeler and Miller until these conditions are complied with.   It is like any other piece of property upon a man's land which he agrees may be removed upon the payment of a certain price.   Can it be said that until the price is paid and the right to remove it acquired, it becomes legally detached from the land and becomes personal property?   If not, this railroad must be a part of the realty.

If the oral and written contracts were not conclusive of the question of the non-delivery of possession, as has been shown, it would be exceedingly narrow to determine it otherwise than from all the circumstances and conditions attending the transactions between the parties, as well as the purposes they had in view. Over all others, stands the fact that the lumber company had this tract of four thousand acres of land and had contracted with the owner of a mill to saw the timber, binding itself, under penalties and forfeitures, to furnish certain quanties of timber within certain periods, so as to keep the mill running. Wheeler and Miller had agreed to build the railroad and stock the timber, but, for want of money, were unable to obtain the materials for the construction of the road.   The lumber company being thus compelled to furnish the materials itself, the original contract, in respect to the building of the road, was abrogated, and nothing was left for Wheeler and Miller to do in that connection but the grading and the laying of the track. This is claimed to have cost them about four thousand dollars, but it is not pretended that they were to own the road-bed. There was no source from which this expenditure could be reimbursed except the profits from their logging contract.   The road-bed thus graded remained the property of the company. When it put the materials upon it at its own expense the entire road became its property, subject to the use of it by Wheeler and Miller, in logging the timber.   When it was decided that the company should furnish the materials an abatement of fifty cents per thousand from the price for logging the timber was made, which was probably reasonable and fair, as the materials cost nearly eight thousand dollars, the equivalent of fifty cents per thousand on about sixteen million feet of timber.   Such being the circumstances, it is beyond belief that the company intended to, or did, in fact, sell said materials to Wheeler and

Miller and deliver to them the possession thereof, without any security whatever. It would be difficult to believe they thought they had any right to do more than place these materials in the road. The company certainly would not have permitted any other use of them.

Enough has been stated to show that the possession of this property cannot be considered to have passed unequivocally into the hands of the purchaser, viewing the matter from the standpoint of a creditor, who is not presumed to have known all that took place between the parties. He must be held to have known the railroad was on the land of the Webster Lumber Company and was used by Wheeler and Miller. To him its situation was far different from that of a horse, cow, wagon, or other property incapable of annexation to real estate, which has been sold and delivered into the hands of the purchaser. But, however it may have appeared to third parties, it is perfectly clear that there was no delivery of possession of the materials or of the railroad to Wheeler and Miller, and the statute relied upon has no application to a conditional sale without delivery of possession.

So much of the decree of the circuit court of Webster County, made and entered on the 9th day of August, 1899, as dissolves the injunction awarded on the 9th day of August, 1897, in so far as the same restrains and enjoins the defendants from taking possession of the rails, spikes, splices, cross-ties and other materials in said railroad, and determines that said rails, spikes, splices and other materials are the property of the defendant, is reversed and in all other respects said decree is affirmed. And this Court proceeding to make such decree as the circuit court should have made and entered, it is adjudged, ordered and decreed that said injunction as awarded on the 9th day of August, 1897, be, and the same is, made perpetual.

BRANNON, JUDGE, *dissenting.*

*Affirmed in Part.     Reversed in Part.*