# CHARLESTON.

## KIRKPATRICK v. DEEGANS.

Submitted February 14, 1903.   Decided April 18, 1903.

53  275
55  412

53  275
f57  86

53 275
60  68

53  275
61  37

53  275
e64  500
64  719

1.  ELECTIONS—*Poll Clerk—Ballots.*
    The clause in section 36 of chapter 3 of the Code of 1899, requiring each poll clerk to "write his name" on the back of each election ballot sheet, before it is delivered to the voter; and the clause in section 66 of said chapter, declaring that "Any ballot which is not· endorsed with the names of the poll clerks, as provided in this chapter, shall be void and shall not be counted;" are mandatory, and ballots not so endorsed must be rejected in ascertaining the result.  (p. 278).

2.  OFFICIAL BALLOTS—*Poll Clerks.*
    The purpose of said clauses is to secure identification of the ballots voted, so as to distinguish them from all unvoted official ballots, as well as from all spurious ballots, in the interest of the purity of elections and the preservation of the secrecy of the ballot.   Hence, the words, "shall write his name," mean that the name of each poll clerk shall be placed on the back of each ballot voted, in his own handwriting, and ballots on which the names of both poll clerks are written by one of them, or by some other person, are void and cannot be counted.   (p. 283).

3.  ELECTIONS—*Poll Clerk.*
    Such requirements, when mandatory, are basic and fundamental in their nature, and the declared consequences of violations of them must follow, whether such violations result from mere ignorance or inadvertance, or actual fraud.  (p. 285).

4.  ELECTIONS—*Ballots.*
    The rule that departures from, or violations of, merely directory statutes, regulating elections, by election officers, will not invalidate votes or elections, in the absence of such actual fraud as clearly vitiates the votes or the election, does not apply in the case of violations of statutory provisions, requiring specific things to be done, and declaring that non-compliance with the requirements shall make the ballot void.   (p. 285).

5.  ELECTIONS—*Ballots—Frauds.*
    The clauses of sections 36 and 66 of chapter 3 of the Code of 1899, requiring identification of the ballots cast, by the signatures of the poll clerks, being reasonable regulations, de·

signed to prevent fraud, are constitutional and valid, although they necessitate the rejection of a very limited number of ballots honestly voted.   (p. 286).

Petition by H. L. Kirkpatrick for writ of *mandamus* to the board of canvassers of Fayette County.

*Writ granted.*

MOLLOHAN, McCLINTIC & MATHEWS, for petitioner.

C. W. DILLON for respondents.

POFFENBARGER, JUDGE:

H. L. Kirkpatrick applies for a peremptory writ of *mandamus*, compelling the Board of Canvassers of Fayette County to reject certain ballots cast at certain precincts of said county in the election held in November, 1902.   He and W. E. Deegans were competitors in said election for the office of Commissioner of the County Court of said county, and on the face of the rturns Deegans had 3,370 votes and Kirkpatrick 3,332. A recount was had upon the demand of Kirkpatrick, which resulted in giving him 3,292 votes and Deegans 3,352 votes, a majority of 60 for Deegans.   At precinct No. 7 of Fayettville district, known as Paint Creek precinct, 123 ballots were deposited, of which there were found to be 95 votes for Deegans and 17 for Kirkpatrick.   At precinct No. 6 in Quinnimont district, known as Quinnimont precinct, 151 ballots were deposited, of which there were found 57 for Deegans and 72 for Kirkpatrick.   The objection to the ballots deposited at Paint Creek precinct is that each of the poll clerks did not write his name on the back of each of the ballots as the law required him to do.   One of the clerks, James Humphreys, placed his own name and that of J. R. Ford, the other poll clerks, on 90 of the ballots, and Ford wrote his own name and that of Humphreys on the remaining 33 ballots.   At Quinnimont precinct, one of the election commissioners wrote the names of both clerks on 68 of the ballots cast there, and there is some doubt as to who signed the names on 12 more of those ballots.   Kirkpatrick contends that all the ballots cast at Paint Creek precinct and those improperly signed at Quinnimont precinct are illegal and must be rejected.

Before filing the return to the *mandamus nisi,* objection was made by the respondents that the plaintiff was precluded by Rule 13 of this Court from making his application here, because he did not show that it had been first made to the circuit court and the writ refused by that court, wherefore they moved to dismiss. That rule requires application to be first made to the circuit court, "unless there are special reasons" for making the application to this Court without having first applied to the circuit court. Nothing stands in the way of this application except a mere rule of practice which this Court, in the exercise of its discretion, has made, and that rule contains an express saving of the right to make the application to this Court in the first instance when there are special reasons for so doing. What is a sufficient reason under this rule is left to the determination of this Court. The speedy ascertainment and declaration of the result of elections has been declared by the legislature to be a part of our State policy. Section 89 of chapter 3 of the Code, says: "A *mandamus* shall lie from the Supreme Court of Appeals or any one of the judges thereof in vacation, returnable before said Court to compel any officer herein to do and perform legally any duty herein required of him." This statute is clearly intended to hasten the ascertainment and declaration of the results of elections, as well as the performance of other duties by election officers. It has been so construed and applied. *Morris* v. *Wertz,* 49 W. Va. 251; *Daniel* v. *Simms,* 51 W. Va. 554. See also *Dunlevy* v. *County Court,* 47 W. Va. 513, and *Marcum* v. *Ballot Commissioners,* 42 W. Va. 263. The legislature has clearly manifested an intention to put *mandamus* against election officers upon a ground exceptional and higher than that upon which it stands in any other case. That is sufficient reason for allowing the application to be made in this Court in the first instance, notwithstanding the general rule against such applications. As a further objection to the same end, it is shown in the return that this application was first made to the circuit court and not refused, but that the plaintiffs dismissed the same in that court without prejudice, and then made a new application in this Court. As he had a right to come to the court of last resort in the first instance, he is not deemed to have lost that right by having first applied to the circuit court, unless the

dismissal entered in the circuit court operates as a bar to any further proceedings. The application was dismissed over the objection of the respondents, and it was expressly done without prejudice to the right of petitioner to ask that or any other court "for another writ of *mandamus* or to institute any other proceedings in relation to the relief sought for therein," as the plaintiff might be advised. In *Parsons* v. *Riley,* 33 W. Va. 464, a dismissal of an action before a justice of the peace after a hearing upon the evidence and argument of counsel was held to be a final adjudication of the rights of the parties, in respect to the cause of action, notwithstanding the entry made by the justice that it was "without prejudice to a new suit." Said case is not relied upon here, nor is it insisted that the order of dismissal is a bar to this proceeding. However, it is well to ascertain whether it does so operate, "A termination of the suit without a consideration of the merits does not affect the cause of action sued upon, nor the legal rights of the parties, except to raise the liability for costs. * * * The judgment or decree of dismissal is not *res adjudicata,* and constitutes no bar to a new proceeding for the same cause of action between the same parties." 6 Enc. Pl. & Pr. 986, 987. A dismissal upon the merits operates as a bar unless the decree expressly states that it is without prejudice. *Id.* 991, 994. "It is likewise the right of the plaintiff in actions at law to take or suffer a voluntary nonsuit where the application is seasonably made, or discontinue his cause at his option either at law, or in equity where a discontinuance is appropriate." *Id.* 834. When a plaintiff acts seasonably he is entitled to control the disposition of his cause upon payment of costs, *Id.* 833; subject to the qualification that he must have leave of the court to dismiss. *Id.* 868. Leave may be withheld or granted in the sound discretion of the court. *Id.* 870. Under these general principles the dismissal in this instance cannot be a bar. It is expressly made without prejudice, with leave of the court, before a hearing or submission upon merits, and before a return to the *mandamus nisi* had been filed.

The two provisions of the statute to be construed in passing upon the validity of the ballots in question are sections 36 and 66 of chapter 3 of the Code. Section 36 is found under the sub-heading, "Preparation and Distribution of Ballots," and the

part thereof involved here reads as follows: "On the back of each sheet of paper on which the ballots are printed as aforesaid, and as near the center thereof as may be, shall be printed the words 'Poll Clerks,' and under them, *each poll clerk shall write his name before the ballot is delivered to the voter.*" Section 66 is found under the sub-heading, "Ascertaining the Result at the Several Election Precincts," and contains the following clause: "Any ballot which is not endorsed with the names of the poll clerks, as provided in this chapter, shall be void and shall not be counted."

It is admitted by the respondents that these provisions of the statute are mandatory. Although in *Snodgrass* v. *County Court,* 44 W. Va. 56, this Court equally divided upon the question whether ballots not signed by each of the poll clerks in his own handwriting are valid, both of the opinions filed assert that the statute is mandatory. Moreover, the two opinions agree that the signatures of both clerks must appear upon the ballot. But, in what may be called the affirming opinion it is held that, although the name of one of the clerks was written by the other on the ballot so that both names were in the same handwriting, the name of the one who did not actually write his own name was nevertheless his signature within the meaning of the statute, and amounted to a substantial compliance with the statute, although it is mandatory. This is the contention of the respondents in this case. The obvious purpose of the legislature in requiring the signatures of the clerks is the identification of the ballot as an official ballot sheet, as a safeguard against the substitution of fraudulent ballots. Such substitution might be made in either of two ways. Ballots might be prepared outside of the election room, ready for deposit in the ballot box, and exactly in the form of the official ballots used on the inside, and if it were understood between the clerks that one of them should sign the names of both, such substitution of ballots, prepared and signed before election day, could be easily made. Another way would be to substitute for the ballots actually voted, after the voting is all done and the result at the precinct ascertained, but before the recount provided for the statute, fraudulent ballots, in exactly the same form and bearing exactly the same names in the same handwriting, but prepared at some time and place other than on election

day and in the election room. All the porvisions of the statute relating to the preparation and distribution of ballots, the manner of conducting the election and the mode of voting have, for one of their objects, the absolute destruction and obliteration of that part of the old election system which permitted ballots to be prepared, for deposit, at any place other than in the election room. The act of 1891 provides for an official ballot, prescribing the kind of paper on which it shall be printed, its form, method of preparation, the persons by whom it shall be prepared, its custody and distribution and all the necessary steps to be taken by both the voter and the officers of the election for its deposit in the ballot box. Among other things, it is provided that such of these ballots as go into the box shall be distinguished from all other ballots, whether official unvoted ballots or not, by means of the signatures of the two clerks, and upon all officers charged with the execution of these provisions, and all other persons violating them in material respects, the law denounces heavy penalties, making a great many of the forbidden acts felonies, punishable by confinement in the penitentiary. All these elaborate provisions, minutely prescribing the duties of election officers, and citizens, have for their object the suppression of corruption, fraud and intimidation in elections. It is well known that at the time the act was passed these evils were general, not only in this State, but throughout the country, and similar laws were passed in a great many of the staates. Of another provision of the statute, relating to the preparation of the ballot, BRANNON, JUDGE, said, in *Morris* v. *Canvassers,* 49 W. Va. 255: "It was intended as, and it is, a valuable reform made to cure ills revealed by time in the most important matter connected with government."

It is no answer to the supposed methods of substitution to say that the two clerks, by corrupt agreement, may accomplish, or promote the accomplishment of, the same thing in the same way. The legislature intended that these two clerks, representing different political parties, should by their signatures, identify every ballot deposited, and it thereby provided as effectually as possible against such substitution. It did not provide against a corrupt agreement between the clerks, further than to prescribe a mode of selecting them, their qualifications and their method of transacting the business, and by denounc-

ing upon them the penalties prescribed for bribery and corruption in officers generally, if such an agreement falls within that class of crimes. Justifiable or not, the legislature proceeded upon the assumption that these are sufficient safeguards against such corrupt agreement. The fraud at which this provision is aimed is possible without such agreement and collusion, if one clerk may sign the names of both. If that may be done in one case, it may be done in all. Upon one pretext or another, a designing and corrupt clerk may obtain the privilege of writing the names of both clerks on all or a part of the ballots, through the ignorance or inadvertance of the other clerk and without any wrongful purpose or design on his part, and so the fraud may be accomplished as effectually as if there had been fraud and collusion on the part of both clerks. Then there is another reason for requiring the signatures of both clerks in their own hand writing. Any attempted forgeries of these signatures in making a substitution of ballots would necessarily be more difficult. The risk of detection in the forgery of two names is manifestly greater than in one. Still another reason exists. If an election clerk is permitted to delegate the writing of his name on the ballot of the other clerk, there is no reason why he should not be permitted to allow any other person to write it for him. In case of his delegating it to a number of persons on the same day at his precinct, the ballots lose the means of identification, almost as completely as if no signatures were required upon them at all. It would become necessary to call in possibly a dozen men from that precinct to ascertain whether the ballots produced on a recount or in a contest are genuine, and even then identification might be impossible. In this case there is a doubt, or at least an alleged doubt, as to whether one of the clerks signed his name on 12 of the ballots cr whether one of the commissioners signed his name on them. Suppose at some precinct that the signatures appeared on the ballots in a dozen different handwritings. Would it not be next to impossible to detect substituted ballots among them? There would be the uncertainty as to how many people put on signatures, and as to the identity of the persons who did put them on. There is still another reason. These differences of handwriting could be made the means of destroying the secrecy of the ballot. The statute, as well as the Constitution, holds the

secrecy of the ballot sacred.   Shall clerks be permitted, by varying the signatures on the backs of the ballots, to ascertain, or make it possible to ascertain, how people vote?   The allowance of the omission here complained of would make it possible to do so. It would be impossible to say just how many abuses and forms of fraud might grow out of this practice.   The legislators must have regarded it as a most vital provision, else they would not have made it mandatory and declared that its violation should make the ballot void.

In the affirming opinion in *Snodgrass* v. *County Court,* 44 W. Va. 56, this question is dealt with upon the assumption that the signature required on the back of an election ballot stands upon the same footing as the signature to a deed, contract or other writing, where the interests of individuals only are affected, and fails to distinctly and positively recognize that it is an instance in which the signature not only affects the public primarily, and not the individual, and in which that signature is intended to identify and make certain the genuineness of the paper upon which it is written.   In the cases of private contracts, it is undoubtedly true that a person may have his name written by another in his presence and thereby bind himself.   In those cases, however, the act of the party evidenced by his signature is the material and important thing, and the signature is intended only as a memorial of the act.   Here the great office of the signature is identification of the paper. A signature is said to consist of two parts, the act of writing the name and the intention of thereby finally authenticating the instrument.   2 Greenl. Ev. 674.   This, however, relates to the signature of an individual to papers of a private nature, and when its sufficinecy is put to the test, he is estopped from denying that it is his signature by proof of the fact that he directed it to be written for him, and that it was done in his presence.   From this proof the act and intent on his part are sufficiently made out.   Signatures are required on the backs of ballots, not for the purpose of binding, in any way, the individual who is required to sign his name on it, but for the sole purpose of distinguishing the ballots which have been voted from all other ballots of the same kind which have not been voted, to the end that, by this simple and reasonable regulation of the exercise of the elective franchise, the door may be partially or

completely. closed against fraud and intimidation. It is in the interest of the public and the purity of elections that these ballots are required to be so identified, and not for the purpose of subserving individual ends. It must be manifest to every reasonable mind that if the handwriting of the clerk be eliminated from this requirement, the barrier against fraud which the legislature has set up in this statute is, in every practical sense, thrown down, and that there is far less certainty in the means of identification so provided.

There can be no doubt about the legislative purpose in prescribing this requirement. In Minnesota, the statute requires the initials of two of the judges of election to be placed on the backs of the ballots. In *State* v. *Gay,* 59 Minn. 6, 19, Collins, J., said of it: "We readily agree with counsel in the assertion that it was the purpose of the legislature, when enacting this law, to purge our methods of conducting elections of some of the evils connected therewith, and to promote the purity of the ballot." The Indiana statute requires the election clerks to endorse their initials on the back of the ballot. Speaking of it in *Parvin* v. *Winberg,* 130 Ind. 561, Coffey, J., said: "The immediate purpose of the provisions of section 34 is to prevent the counting of fraudulent votes by requiring the poll clerks to indorse their initials upon the official ballots, to the end that they may be identified when taken from the balot box." As has been shown, the necessity for identification is by no means limited to the time when the ballot is taken from the ballot box. The opportunity for fraudulent substitution is far greater in that period interevning between the count of the vote at the election precinct and the recount which it is possible to have several days afterwards, during which the ballots are lying, in many instances, in insecure county court clerks' offices, and within the easy reach of the evil minded. Hence, the view taken by the Indiana judge stops far short of the full purpose of the statute, although he clearly states the principle upon which it is based. "In jurisdictions where the law requires the use of official ballots, the statutes often provide that on the back of such ballots shall be printed or stamped certain words indicative of the official character; and to prevent the counting of fraudulent votes, such statutes sometimes require certain election officials to indorse their names or initials upon the official ballot." 10 Am. & Eng. Ency. Law, (2nd Ed.), 714.

It is clear that in requiring the names of the clerks to be written on the backs of the ballots in their own handwriting, the legislature has adopted a better safeguard against the substitution of ballots than would have been made had the requirement been merely that their names appear on the ballots. That this is what was intended by the legislature is equally clear for the statute says that *"each poll clerk shall write his name"* on the back of the ballots. Then it says that "any ballot which is not endorsed with the names of the poll clerks, *as provided in this chapter,* shall be void and shall not be counted." How could the legislature have made its purpose more manifest or put this requirement in more certain terms? It might have said the names of the poll clerks shall be written on the backs of the ballots in their own handwriting, but do not the words *"shall write his name"* mean exactly the same thing? If the language were, the names of the poll clerks shall be indorsed or shall be placed on the back of the ballot, the construction contended for by the respondents might be accepted, but how can it be reasonably said that this statute does not mean what it actually says, namely, that each poll clerk shall write his name on the back of the ballot? In construing this language, it is necessary to keep in mind the purpose which the legislature had in inserting that clause in the statute. *Daniel* v. *Simms,* 49 W. Va. 554, 560, point 5 of the syllabus. The purpose being so absolutely beyond question, it would be unwarranted by any rule of construction, to so construe this language as to defeat, in whole or in part, the very object intended to be accomplished by it. Keeping in mind this object, it is equally apparent that the signing of both names by one of the clerks is not a substantial compliance with the requirement.

But it is insisted that the ballot will not be rendered invalid by a mistake, or failure of duty, on the part of the election officer, when the voter has done all that is required of him. It is true, that where there is any room for a construction that will sustain the legality of a vote, the court will apply it, especially when the objection is not based upon a failure of duty on the part of the voter. But the authorities do not bear out the assertion that the court will sustain an election or uphold the legality of votes, when mandatory provisions of the statute have been violated. In this connection, *Hollandsworth* v. *Dial,* 39

W. Va. 1, is relied upon. In that case, the requirement that poll clerks be of opposite politics was ignored, and the election commissioners, without authority, appointed two additional clerks. These were irregularities, departures from the statutory provisions, but the statute. did not declare that in case of such irregularity the election should be void, or that the ballots cast under such conditions should be void or should not be counted. There was room there for construction in the effort of the court to uphold an honest vote where there was no suspicion of actual fraud on the part of the election officers. The same principle has been applied in many other similar cases. Here, however, we have a statute mandatorily requiring a certain thing to be done, and declaring that if the requirement is not complied with the ballot shall be *void and shall not be counted.* No case has been found, nor is it believed that any exist, in which the court has held that the disobedience to such a requirement does not invalidate the ballot, when the statute itself is held to be constitutional. Speaking of statutes prescribing the form and size of ballots and the kind of paper upon which they are to be printed, etc., 10 Am. & Eng. Ency Law, 2 Ed., at page 726, says: "These statutes, being designed to preserve the secrecy of the ballot and to prevent fraud, intimidation, and bribery, will generally be considered. mandatory; *and this will be so in all cases where the statute provides that a ballot varying from the requirements of the law shall not be counted?* In *State* v. *Sadler,* 25 Nev. 131, (83 Am. St. Rep. 573), ballots were rejected for the reason that, although official, two kinds have been printed and used at the precinct, under the misconception of the law on the question of whether or not a candidate had resigned. There, the fault was that of the public officers, and not of the voters. There were about 55 of such ballots. In reference to these ballots, the court said: "Not only is uniformity in paper required, but uniformity in printing is regarded as essential to secure the secrecy of the ballot, through which fraud and corruption are to be prevented." *Lankford* v. *Gebhart,* 130 Mo. 621, holds that, "Statutes. requiring that ballots on account of want of conformity to any particular of the law, shall not be counted, are mandatory." It further holds: "If a ballot is numbered and recorded on the election poll-book without any

name being written opposite thereto to designate the person who voted the ballot, parol evidence is not admissible to identify, nor to supply the name of, the voter." The omission of the name was an act of the clerk, with which the voter had nothing whatever to do, and the Supreme Court held that the vote had been improperly counted. In *Bowers* v. *Smith,* 111 Mo. 45, (33 Am. St. Rep. 491), it was held that: "When the election law itself declares a specified iregularity in an election to be fatal, courts will follow that command irrespective of their views of the importance of the requirement, but in the absence of such mandatory provision, an irregularity not so vital as to prevent a free and full expression of the popular will, will be considered as immaterial, and will not vitiate the whole return." In *Orr* v. *Bailey,* 59 Neb. 128, ballots were rejected because only one judge of the election had signed his name on the back of them, when the statute required the signatures of two of the judges, and provided that unless they were so signed they should not be counted. The same was held in *Mauck* v. *Brown,* 59 Neb. 382.

Further authority to the same effect is found in McCrary on Elections, 4th Edition. At section 225, he admits that mere irregularity on the part of election officers, or their omission to observe some merely directory provisions of the law, will not vitiate the poll, but in section 226, he says, after referring to a case in 53 Mo., in which the statute requiring the ballots to be numbered according to the numbers on the poll-books was held to be mandatory: "Although this doctrine may sometimes result in very great hardship and injustice by depriving the voters of their rights by reason of the negligence or misconduct of the officers of election, it is nevertheless difficult to see how any different construction could have been placed upon such a statute. Statutes which simply direct the judges of election to number the ballots, without declaring what consequences shall follow if this be not done, may well be held directory only; but where the statute both gives the directions and declares what the consequences of neglecting their observance shall be, there is no room for construction. Such statutes are intended to prevent fraudulent voting; and if the legislature is of the opinion that the general good to be derived from their strict enforcement will more than counterbalance the evils re-

sulting from the occasional throwing out of votes honestly cast, the courts cannot reconsider the mere question of policy. The legislative will upon such a subject, when clearly expressed, must prevail." *Major* v. *Barker* (Ky.) 35 S. W. Rep. 543; *Slaymaker* v. *Phillips* (Wyo.) 42 Pac. Rep. 1049; *State* v. *Connor*, 86 Tex. 133; *Russell* v. *McDowell*, 83 Cal. 70; *Sego* v. *Stoddard*, 136 Ind. 297; *Kreitz* v. *Behrensmeyer*, 125 Ill. 141.

In section 227, he quotes the following from *Gilleland* v. *Schuyler*, 9 Neb. 569: "Questions affecting the purity of elections are in this country of vital importance. Upon them hangs the experiment of self government. The problem is to secure, first, to the voter a free, untrammeled vote; and secondly, a correct record and return of the vote. It is mainly with reference to these two results that the rules for conducting elections are prescribed by the legislative power. But these rules are only means. The end is the freedom and purity of the election. To hold these rules all mandatory and essential to a valid election is to subordinate substance to form, the end to the means. Yet, on the other hand, to permit a total neglect of all the requirements of the statute, and still sustain the proceedings, is to forego the lessons of experience and invite a disregard of all those provisions which the wisdom of years have found conducive to the purity of the ballot-box. Ignorance, inadvertance, mistake, or even intentional wrong on the part of local officials, should not be permitted to disfranchise a district. Yet rules and uniformity of procedure are as essential to procure truth and exactness in elections as in anything else. Irregularities invite and conceal fraud." This is the language of Brewer, J., now associate justice of the Supreme Court of the United States. The alleged grounds of invalidity in that case were mere departures from statutes held to be directory and not violations of mandatory statutes.

Much stress is laid upon the fact that the evidence shows that no fraud was either perpetrated or intended at the precincts at which this statutory requirement was omitted. This argument would be sufficient if the omissions could be classed as mere irregularities. Where such irregularities are accompanied by fraud, which establishes the impurity of the election at the precinct, it is generally held that the election is void. But where mere irregularities, not violations of mandatory

statutes, are the result of a mistake or ignorance, they do not vitiate the election. The question here is not affected by the presence or absence of actual fraud. The ballots are, by express declaration of the law, void, without reference to the presence or absence of fraud. No case has been brought to the attention of the Court in which it has been held that, where a mandatory statute has been violated, it must be further shown that such violation was accompanied by actual fraud, in order to make the ballots invalid, and it is not believed that any such case exists. The Missouri statute, requiring the number opposite the voter's name on the poll-book to be placed on the back of the ballot voted by him, is designed to prevent only the casting of illegal votes. It is intended to secure identification of the man who casts the vote to the end that fraud may be suppressed, and not to identify the ballot which is a far more important matter. The fraudulent voter can do mischief only on election day, in open daylight and in the peresence of assembled voters, while the man who substitutes a fraudulent for a genuine ballot goes at the midnight hour when honest men are asleep and executes his dastardly purpose, and for its execution, he has several nights between the election day and the time of the recount. That is the evil against which the provisions of our statute, now under consideration are aimed. It was not the intention of the legislature that the enforcement of this statute should be limited to particular cases and made to depend upon the proof of a thing which is generally very difficult to prove. Fraud is always concealed, covered and hidden. The absence of fraud or any intention to commit fraud was urged upon this Court in the case of *Daniel v. Simms,* but it was unavailing. The violations of the statute in that case were violations of a mandatory provision, similar to the one now under consideration, but not so manifestly intended for the prevention of post-election fraud.

The constitutionality of these provisions is not questioned. Under the construction contended for by the respondents, there is no necessity for calling in question the validity of the statute. But as the constitutionality of the statute is germane, it is not out of place to say something on the subject. Cooley Const. Lim., sec. 757, says: "All such reasonable regulations of the constitutional right which seems to the legislature im-

portant to the preservation · of order in elections, to guard against fraud, undue influence, and oppression, and to preserve the purity of the ballot box, are not only within the constitutional power of the legislature, but are commendable, and at least some of them absolutely essential." Several decisions have been referred to in which similar statutes, operating just as harshly upon the voter, and far less meritorious and essential to the purity of the ballot, have been enforced, and it is not to be supposed that all these courts have passed over the question of their validity. It was not ignored in *Orr* v. *Bailey,* 59 Neb. 128, which has been cited. On the contrary the constitutionality of the statute requiring the signatures of two judges on the back of the ballot was expressly decided. There is perhaps no better test of the reasonableness of a regulation than the manner of its operation. The record accompanying the petition in this case shows that in Fayette County, there are 74 election precincts, and there is no intimation that this statute was violated in more than two of them. The statute was passed twelve years ago, and this is the second case turning upon the violation of this provision that has come to this Court. The other was that of *Snodgrass* v. *County Court,* in which the validity of the ballots of but one precinct was denied upon that ground. This indicates that out of the thousands of precinct elections held in this State since the passage of the act, a great many of the ballots used in which, have passed through the hands of canvassing boards, there have been very few in which this provision has been violated, notwithstanding the fact that the vast army of commissioners and election clerks have been, for the most part, men without legal training or knowledge of · the law. They have followed a plain, simple, reasonable, statutory provision, and the evil resulting from holding the ballots in this case and any other cases that may come to this Court on that ground, invalid, is very insignificant, as compared with the great purpose for the accomplishment of which the statute is intended. In one state of the Union, namely, Washington, a statute prohibiting the counting of ballots not indorsed with the initials of election officers, has been held unconstitutional. *Moyer* v. *Van De Vanter,* 12 Wash. 377. But for that decision no precedent is cited, and the opinion shows that the reasoning of the court in reaching that con-

clusion strikes at the very root of all that system of ballot reform law, which, by reasonable and just regulation of the exercise of the elective franchise, has so commended itself to the good sense of the people that it has been adopted in nearly all the states of the Union, and by practically all English speaking municipalities. Of course a supposed case might be put in which the three commissioners and the two clerks at an election precinct would wilfully and deliberately violate this provision for the express purpose of invalidating the vote at that precinct. But would such a supposition be a reasonable one? Is not a majority always represented in the officers of the election? Is it fair to presume that the majority so represented, will corruptly and deliberately invalidate the vote at the precinct or permit it to be done? In upholding the validity of its own vote, by complying with these provisions, the majority sustains the vote of the minority. Under the statute, moreover, the voters themselves, representing each party, have a large measure of control over the precinct election officers. Each party may select its own clerk, and if they do so, the commissioners of election are bound to appoint him. Thus, they have the power at all times to place an honest representative at this important post, and thereby prevent the consummation of any corrupt agreement into which all the commissioners might enter for the purpose of opening this door to post-election fraud. The provision is not an unreasonable one. It operates no abridgment of the right of the voter to such an extent as ought to render it unconstitutional in view of the salutary purpose for which it was passed, and the authorities, generally, clearly sustain its constitutionality.

For these reasons, the peremptory writ of *mandamus* prayed for should be awarded.

*Writ Awarded.*

DENT, JUDGE, (*concurring*):

I concur in the opinion and conclusion reached in this case for the reason that the statute expressly provides that on the ballots, "Each poll clerk shall write his name before the ballot is delivered to the voter," and "any ballot which is not endorsed with the names of the poll clerks as provided in this chapter shall be void and shall not be counted."

This was my opinion in the case of *Snodgress* v. *The County Court,* 44 W. Va. 56, and had that case been decided in harmony with the statute this case would not have been here. It has been well said "that a question is never settled until settled rightly," then it stays settled. If this Court had failed in this case to settle this question rightly, it would not have remained settled, but it would have continually returned in some form to trouble the Court. It will now remain settled. It is hard thus to defeat the popular will, and I would not agree to do so did not the imperative and mandatory language of the act require it. In the cases of *Morris* v. *Wertz,* 49 W. Va. 251, and *Davis* v. *Simms,* 51 W. Va. 554, there was no such positive enactment involved, and I dissented and refused to be a party to the overthrow of the will of the people in the absence of such enactment. It is strange, however, that the construction of the statute should uniformly result in ousting a democrat from office and putting in a republican, almost invariably contrary to the expressed will of the people, as shown on the face of the ballots. *Morris* v. *Wertz,* 49 W. Va. 251; *Daniel* v. *Simms,* 51 W. Va. 554; *Dent* v. *Commissioners,* 45 W. Va. 750; *Curry* v. *Means,* not reported; *Hebb* v. *Co. Court,* 49 W. Va. 733; *Snodgrass* v. *Co. Court,* 44 W. Va. 56; *Kirkpatrick* v. *Deegan,* now decided. Such is the irony of fate, and it more firmly anchors my belief in foreordination, predestination and election, except by the people. *Dunlevy* v. *County Court,* 47 W. Va. may be said to be an exception. That case, which is overruled at least in part by the later cases of *Morris* v. *Wertz* and *Daniel* v. *Simms,* owes its salvation to the laudible impartiality of an incorruptible and upright circuit judge, whose perfect freedom from partizan bias led him to obey the manifest will of the people. Election officers have no duties they can transmit to successors or entrust to agents, but their duties are all personal. Whenever the legislature makes the feailure to perform such duties in the manner provided, a sufficient cause to avoid the ballots affected thereby, the courts cannot do otherwise than submit its behests, even though the will of the people be defeated, otherwise the will of the people should prevail. This is and has been my position in all these election cases, and I have no disposition to vary therefrom in the present case Hence my concurrence.

Brannon, Judge, (*dissenting*) :

There is no suggestion whatever that the ballots in question are not the true ballots—no hint that they do not show the true, honest result of the election. Seeing ro reason to change the views I gave in *Snodgrass* v. *Wetzel County Court*, 44 W. Va. 56, I dissent from the judgment in this case. ·

McWhorter, Judge:

For the same reasons expressed in the foregoing note of Judge Brannon, also dissents from the opinion of the majority of the Court.